## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Consumer Financial Protection Bureau, <br><br> Plaintiff, <br><br> v. <br><br> Craig Manseth, Jacob Adamo, Darren Turco, United Debt Holding LLC, JTM Capital Management, LLC, and United Holding Group, LLC also known as United Holdings Group, LLC, UHG, LLC, UHG I LLC, and UHG II LLC, <br><br> Defendants. | Case No. 1:22-cv-29 <br><br> **COMPLAINT** |

The Consumer Financial Protection Bureau (Bureau) brings this action against Defendants Craig Manseth, Jacob Adamo, Darren Turco, United Debt Holding LLC (UDH), JTM Capital Management, LLC (JTM), and United Holding Group, LLC (also known as United Holdings Group, LLC, UHG, LLC, UHG I LLC, and UHG II LLC) (UHG) and alleges as follows:

## <u>INTRODUCTION</u>

1.     UDH, JTM, and UHG are debt collectors that have purchased defaulted consumer debt worth tens of millions of dollars. They place the debt portfolios they purchase with, or sell them to, other debt collection companies.

2.      Since at least 2014, UDH, JTM, and UHG have knowingly or recklessly placed and sold debts to debt collection agencies that used threats and misrepresentations to coerce payments from consumers.

3.      Craig Manseth, Darren Turco, and Jacob Adamo (collectively "Individual Defendants") directed or controlled the unlawful conduct of UDH, JTM, and UHG and also participated directly in the unlawful conduct of UDH, JTM, and UHG.

4.      Manseth owned and managed UDH, a debt buyer in Colorado.

5.      Turco was Executive Vice President for UDH, reporting to Manseth.

6.      Adamo owned and managed JTM, a debt buyer based in this district.

7.      The Individual Defendants joined forces to create and operate UHG, a debt buyer based in this district. UHG then took over the ongoing business of UDH and JTM.

8.      The Defendants knew or should have known the debt collection agencies with which they placed and sold debt were making false threats and false statements to consumers. But, despite that knowledge, they continued to place and sell debts to them.

9.      Defendants' illegal practices violated the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1), 5536(a)(3).

10.     Defendants UHG and JTM's practices also violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

12.     Venue is proper in this district because Defendants do business here. 12 U.S.C. § 5564(f).

## PARTIES

13.     The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer-financial products and services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to enforce Federal consumer financial laws, including the CFPA and the FDCPA. 12 U.S.C. §§ 5564(a)-(b); 5481(12), (14).

## UDH

14.     UDH is a Delaware limited-liability company with its principal place of business at 383 Inverness Parkway, Suite 280, Englewood, Colorado.

15.     The principal purpose of UDH's business was collecting on debt.

16.    UDH purchased portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance. UDH then placed the portfolios with or sold them to other debt-collection companies, and some of those debt-collection companies in turn placed or sold the portfolios to downstream debt collection companies and on down the line (collectively, "Debt Collectors").

17.    The Debt Collectors that UDH placed debt with collected the defaulted consumer debts on UDH's behalf.

18.    Most of the debts UDH purchased, collected on, and sold were primarily for use by consumers for personal, family, or household purposes.

19.    Many of the debts UDH purchased, collected on, and sold were for extensions of credit, such as payday loans, sub-prime credit cards, online installment loans, and auto loans.

20.    From at least 2014 through at least mid-2018, UDH engaged in the business of debt collection in this district.

21.    UDH entered agreements for the provision of debt-collection services that occurred at least in part in this district.

22.    Debt Collectors located in this district collected debt from consumers on behalf of UDH.

23.    UDH has also engaged in the business of debt collection throughout the United States.

24.     The activities described in Paragraphs 14 through 23, above, are "consumer financial products or services" under the CFPA, 12 U.S.C. § 5481(5), (15)(A)(i), (15)(A)(x)

25.     UDH is a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

## JTM

26.     JTM is a Delaware limited-liability company with its principal place of business in this district at 6400 Sheridan Drive, Suite 138, Williamsville, New York.

27.     The principal purpose of JTM's business is collecting on debt.

28.     The majority of JTM's revenue was from debt collection.

29.     JTM purchased portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance and then placed the portfolios with or sold them to other Debt Collectors.  Some of those Debt Collectors in turn placed or sold the portfolios to downstream Debt Collectors.

30.     The companies that JTM placed debt with collected the defaulted consumer debts on JTM's behalf.

31.     Most of the debts JTM purchased, collected on, and sold were primarily for use by consumers for personal, family, or household purposes.

32.     Many of the debts JTM purchased, collected on, and sold were for extensions of credit, such as payday loans, sub-prime credit cards, online installment loans, and auto loans.

33.     From at least 2015 to at least 2019, JTM engaged in the business of debt collection in this district.

34.      JTM entered agreements in this district for the provision of debt-collection services that occurred at least in part in this district.

35.     Debt Collectors located in this district collected debt from consumers on behalf of JTM.

36.     JTM also engaged in the business of debt collection throughout the United States.

37.     The activities described in Paragraphs 26 through 36, above, are "consumer financial products or services" under the CFPA, 12 U.S.C. § 5481(5), (15)(A)(i), (15)(A)(x).

38.     JTM is a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

## UHG

39.     UHG is a Delaware limited-liability company with its principal place of business in this district at 6400 Sheridan Drive, Suite 138, Williamsville, New York.

40.     The principal purpose of UHG's business is collecting on debt.

41.     The majority of UHG's revenue was from debt collection.

42.     UHG bought portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance and then placed the portfolios with or sold them to other Debt Collectors. Some of those Debt Collectors in turn placed or sold the portfolios to downstream Debt Collectors.

43.     The Debt Collectors that UHG placed debt with collected the defaulted consumer debts on UHG's behalf.

44.     Most of the debts UHG purchased, collected on, and sold were primarily for use by consumers for personal, family, or household purposes.

45.     Many of the debts UHG purchased, collected on, and sold were for extensions of credit, such as payday loans, sub-prime credit cards, online installment loans, and auto loans.

46.     From at least 2017 to the present, UHG engaged in the business of debt collection in this district.

47.      UHG entered agreements in this district for the provision of debt-collection services that occurred at least in part in this district.

48.     Debt Collectors located in this district collected debt from consumers on behalf of UHG.

49.     UHG also engaged in the business of debt collection throughout the United States.

50.    The activities described in Paragraphs 39 through 49, above, are "consumer financial products or services" under the CFPA, 12 U.S.C. § 5481(5), 15(A)(i), 15(A)(x).

51.    UHG is a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

### Manseth

52.    Craig Manseth resides in Parker, Colorado.

53.    In 2008, Manseth founded UDH, which he owned and operated.

54.    At all relevant times, Manseth has served as Chief Executive Officer and President of UDH.

55.    From at least 2014, and at all relevant times, Manseth had managerial responsibility for UDH and materially participated in UDH's affairs.

56.    Manseth determined which debt portfolios UDH purchased, which Debt Collectors bought debt from UDH or collected on debt for UDH, and which Debt Collectors were terminated.

57.    Manseth negotiated the terms and prices for UDH's purchase and collections agreements and communicated with Debt Collectors and original creditors about consumer complaints, which included handling escalated complaints.

58.    Manseth developed UDH's business strategies and practices and oversaw UDH's workforce.

59. Due to the size and structure of UDH and Manseth's roles in operating the company, Manseth knew or should have known that UDH was engaging in the violations described herein.

60. Manseth is also a founder, Co-Chief Executive Officer, and Chief Financial Officer of UHG.

61. Since 2017, Manseth has had managerial responsibility for UHG and has materially participated in its affairs.

62. Manseth, along with Turco and Adamo, determined which debt portfolios UHG purchased.

63. Manseth determined which Debt Collectors bought debt from UHG.

64. Manseth negotiated financing for UHG and signed binding documents on behalf of UHG.

65. Manseth, along with Turco and Adamo, developed UHG's business strategies and practices and oversaw UHG's workforce.

66. Due to the size and structure of UHG and Manseth's roles in operating the company, Manseth knew or should have known that UHG was engaging in the violations described herein.

67. Manseth is a "related person" under the CFPA. 12 U.S.C. § 5481(25)(C)(i), (ii). Because Manseth is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. § 5481(25)(B).

68.     Through UDH and UHG, Manseth has conducted business in this district from at least 2014 to the present.

## Adamo

69.     Adamo resided in this district, in Pendleton, New York at all times relevant to this complaint.

70.     Adamo is the founder and an operator and owner of JTM.

71.     Since at least 2014, Adamo has had managerial responsibility for JTM and has materially participated in its affairs.

72.     Adamo:

      a.     developed JTM's business strategies and practices;

      b.     monitored Debt Collectors' activities and compliance, which included handling escalated complaints; and

      c.     oversaw JTM's workforce.

73.     Due to the size and structure of JTM and Adamo's roles in operating the company, he knew or should have known that JTM was engaging in the violations described herein.

74.     Adamo is also a founder, Co-Chief Executive Officer, and Chief Operations Officer of UHG.

75.     Since 2017, Adamo has had managerial responsibility for UHG and has materially participated in its affairs.

76.     Adamo, along with Manseth and Turco, determined which debt portfolios UHG purchased.

77.     Adamo determined which Debt Collectors collected on debt for UHG and which Debt Collectors were terminated.

78.     Adamo, along with Turco, monitored Debt Collectors' activities and compliance, which included handling escalated complaints, on behalf of UHG.

79.      Adamo, along with Manseth and Turco, developed UHG's business strategies and practices and oversaw UHG's workforce.

80.     Due to the size and structure of UHG and Adamo's roles in operating the company, Adamo knew or should have known that UHG was engaging in the violations described herein.

81.     Adamo is a "related person" under the CFPA. 12 U.S.C. 5481(25)(C)(i), (ii). Because Adamo is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. 5481(25)(B).

82.     Through JTM and UHG, Adamo has conducted business in this district from at least 2014 to the present.

## Turco

83.     Darren Turco resides in Parker, Colorado.

84.     Prior to 2017, Turco was employed by UDH as its Executive Vice President, where he reported to Manseth and assisted with managing compliance

issues relating to Debt Collectors.

85.   Turco is a founder and Co-Chief Executive Officer of UHG.

86.   Since 2017, Turco has had managerial responsibility for UHG and has materially participated in its affairs.

87.   Turco, along with Manseth and Adamo, determined which debt portfolios UHG purchased.

88.   Turco, along with Adamo, monitored Debt Collectors' activities and compliance, which included handling escalated complaints, on behalf of UHG.

89.   Turco communicated with original creditors on behalf of UHG about consumer complaints.

90.   Turco, along with Manseth and Adamo, developed UHG's business strategies and practices and oversaw UHG's workforce.

91.   Due to the size and structure of UHG and Turco's roles in the company, Turco knew or should have known that UHG was engaging in the violations described herein.

92.   Turco is a "related person" under the CFPA. 12 U.S.C. 5481(25)(C)(i), (ii). Because Turco is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. 5481(25)(B).

93.   Through UHG, Turco has conducted business in this district from at least 2017 to the present.

## FACTS

### Background on UDH

94.     From its inception, Manseth used UDH to purchase millions of dollars in defaulted consumer debt for pennies on the dollar.

95.     Beginning in or before 2014, UDH's primary lines of business were placing consumer debt with and selling consumer debt to other Debt Collectors.

96.     In some situations, UDH placed its debt with Debt Collectors called "master servicers," who then placed it with other Debt Collectors that collected the debts on UDH's behalf and with UDH's knowledge.

97.     Sub-agencies and master servicers would then remit a percentage of the amount collected from each consumer to UDH, as required by their agreements.

98.     UDH also sold debt to Debt Collectors and entered into agreements with some Debt Collectors that required the Debt Collectors to make ongoing payments to UDH.

99.     UDH had the authority to repurchase or recall any debts, to terminate its contracts with any sub-agencies, and to stop master servicers from placing any UDH debt with specific Debt Collectors due to compliance concerns, at any time.

### UDH's Relationship with JTM

100.   UDH started placing debt with JTM as a master servicer in 2015.

101.    UDH's compliance department periodically requested recorded debt-collection phone calls from most of the Debt Collectors with which UDH placed debt.

102.    From 2015 through January 2017, UDH's compliance staff reviewed recorded phone calls from JTM's Debt Collectors and found that many contained major violations of the FDCPA or the CFPA's prohibition against unfair, deceptive, or abusive acts and practices.

103.    In 2015 and 2016, UDH received complaints from consumers whose accounts were placed by or with JTM, complaining that they had been threatened with arrest, jail, or a lawsuit if they did not pay.

104.    In approximately 2016, UDH's then-compliance manager told Manseth and Turco that UDH should stop using JTM.

105.    Instead of terminating JTM, however, UDH, with Manseth's and Turco's knowledge, increased its reliance on JTM to collect its debts.

106.    In 2017, UDH placed more than 380,000 accounts with JTM and was using JTM almost exclusively as its master servicer.

107.    JTM continued to serve as UDH's master servicer through mid-2018.

**UDH and JTM Transition Their Business Activities to UHG**

108.    In May 2017, the Individual Defendants co-founded UHG.

109.    UDH and JTM soon began transitioning nearly all aspects of their

business to UHG.

110.   In May 2017, UDH and UHG signed a written agreement obligating UHG to handle all or almost all of UDH's business affairs in exchange for all or most of the profit derived from UDH's ongoing affairs.

111.   In May 2017, JTM and UHG signed a written agreement obligating UHG to handle all or almost all of JTM's business affairs in exchange for all or most of the profit derived from JTM's ongoing affairs.

112.   From September 2017 through April of 2020, the Defendants collectively placed more than 6.5 million accounts with a face value of more than $8 billion.

113.   Around 2017 and 2018, UDH assigned its then-existing debt portfolios to UHG.

114.   By January 2018, then-employees of UDH and JTM became employees of UHG.

115.   By January 2018, the office spaces used by UDH and JTM transitioned to become office space for UHG.

116.   The work of transitioning all of UDH's business to UHG was handled by UHG employees.

117.   The work of maintaining and transitioning JTM's business to UHG was handled by UHG employees.

118.   UHG continued to use the same policies and procedures as UDH, often without changing anything but the name of the business entity.

119.   UHG continued to use the same technology, the same software systems, and the same vendors pursuant to the same contracts as UDH.

120.   UHG continued to use JTM's and UDH's portfolios, consumer data, account details, and performance statistics to obtain new financing and business, and to collect on existing portfolios.

121.   UHG continued to use the same complaints-management system as JTM and UDH.

122.   For all intents and purposes, UDH, JTM, and UHG have operated as a single entity under the control of the Individual Defendants since at least mid-2017.

123.   But Defendants have misrepresented the connections and ongoing nature of their various business entities. For example, a Colorado state agency found that Turco submitted a false affidavit when applying for UHG's collection agency license by omitting any reference to his prior work with UDH. Colorado had previously taken action against UDH, alleging that certain of its Debt Collectors had made false threats of lawsuits and false threats of arrest or criminal proceedings, among other violations.

**Defendants' Relationships with Placement Debt Collectors**

124.    UDH, JTM, and UHG, at the direction of the Individual Defendants, contracted with Debt Collectors to collect debt on behalf of UDH, JTM, and UHG, either directly or through another Debt Collector.

125.    UDH, JTM, and UHG provided the Debt Collectors collecting on their behalf with consumers' contact information, personal identifying information, and account details related to the debt the consumers allegedly owed.

126.    UDH, JTM, and UHG authorized the Debt Collectors to contact the consumers directly.

127.    The Debt Collectors used information provided by UDH, JTM, and UHG to collect directly from consumers.

128.    In some instances, the Debt Collectors told consumers they were collecting on behalf of UDH, JTM, or UHG.

129.    In some instances, when UDH, JTM, or UHG spoke directly to the consumers, they directed consumers back to the Debt Collectors to work out the details of debt payment or to verify the debt.

130.    The Debt Collectors remitted a percentage of the amount collected from each consumer to UDH, JTM, and UHG, pursuant to their agreements.

131.    From at least 2015 to the present, UDH, JTM, or UHG, as well as the Individual Defendants, exercised control over the Debt Collectors collecting on the

debt placed by Defendants.

132.   UDH, JTM, and UHG provided written guidance to the Debt

Collectors which, on paper at least, required certain conduct standards, audits,

testing, and training of staff.

133.   UDH, JTM, and UHG, as well as the Individual Defendants, also had

the authority to instruct Debt Collectors about how to handle consumer complaints,

whether to discipline collection employees, and how to change collection behavior.

134.   UDH, JTM, and UHG, as well as the Individual Defendants, had the

authority to remove accounts from Debt Collectors and to refuse to send additional

accounts to Debt Collectors.

## False Threats of Lawsuits

135.   From at least 2015 through mid-2018, UDH placed debt directly or

through JTM or another master servicer with Debt Collectors that made implied

and express misrepresentations that, if consumers did not settle their debts now,

they would be sued.

136.   During calls with consumers, some of the Debt Collectors made

express and implied representations that their contact with consumers represented a

final step before "the client" would file suit, or otherwise indicated that their

contact with consumers represented a final step before suit. Some of these Debt

Collectors told consumers their status or account was pre-legal, in mediation, or in

arbitration as part of that representation.

137.   At least one of these Debt Collectors repeatedly and falsely threatened that consumers were going to be served with legal papers imminently at home or at work.

138.   From at least 2015 to at least 2019, JTM continued to place debt with and sell debt to some of the same Debt Collectors referenced in Paragraphs 135-137 as well as other Debt Collectors that made express and implied representations that their contact with consumers represented a final step before "the client" would file suit, or otherwise indicated that their contact with consumers represented a final step before suit. Some of these Debt Collectors told consumers their status or account was pre-legal, in mediation, or in arbitration as part of that representation.

139.   From at least 2018 to at least March 2020, UHG placed debt with and sold debt to some of the same Debt Collectors referenced in Paragraphs 135-137 as well as other Debt Collectors that made express and implied representations that their contact with consumers represented a final step before "the client" would file suit, or otherwise indicated that their contact with consumers represented a final step before suit. Some of these Debt Collectors told consumers their status or account was pre-legal, in mediation, or in arbitration.

140.   For example, a Debt Collector referenced in Paragraphs 135, 136, 138, and 139 made the following statements to consumers:

    a. "The problem is in order to secure this claim, you have to have something down to validate payment information for this month before the filing date and the filing date would be at the end of the month. They're seeking restitution for $750.94. In order to really get it where they would not pull this and file against you, to have an arrangement set on file and that would basically mean you would definitely need to have something down . . . so that has to be electronically attached by our clients attorneys they have that in order to secure past the date that it is scheduled to file out."

    b. "I'm the one who is assigned to this case, in accordance with Texas state law you do have the right to be notified prior to any action or judgment being filed against you ah in state supreme court. So we have been retained concerning a breach of contract. We handle mediation ah for a group of investing attorneys . . ."

141.   None of the Debt Collectors referenced above were authorized by UDH, JTM, or UHG to sue consumers.

142.   None of the Debt Collectors referenced above sued consumers on debts they were collecting for UDH, JTM, or UHG.

143.   UDH, JTM, and UHG had no imminent plan to sue the consumers threatened by the Debt Collectors when these statements were made.

20

## False Statements about Credit Reporting

144.   Some of the Debt Collectors with which UDH, JTM, or UHG placed debt, or their downstream Debt Collectors, made representations that consumers' credit scores or credit histories would be impacted positively if they paid the debt or, conversely, would be impacted negatively if they did not pay the debt.

145.   UDH, JTM, and UHG did not furnish information to credit-reporting agencies regarding these debts.

146.   None of the Debt Collectors making those statements furnished information to credit-reporting agencies regarding these debts.

## False Threats of Arrest or Jail

147.   Since 2015, Defendants have received complaints from more than 500 consumers that Debt Collectors collecting on debt placed by Defendants or sold by Defendants have made express or implied misrepresentations that consumers would be arrested, jailed, or face criminal charges if they did not pay their debts.

148.   For example, consumers made the following complaints about agents who were collecting on debt that was sold by UDH or placed for collection by UDH:

a.   Agents were "harassing me," a collector "came to my work," and was "making threats to take me to court, jail, harassing family, and now coming to my work."

b.  A collector "threatened me with arrest if I didn't pay $500. I didn't have the money as I'm on social security. I went and got a car title loan of $400 to send the money to avoid jail."

c.  My "HS-age daughter's rcvd threatening calls @ her school saying 'your mommy's going to be in jail, you can visit your mother in jail.'"

d.  A collector "is threatening to send me to jail, prosecute me, even going as far as bodily harm. I will be filing a complaint with my local police department, because they have me too afraid to leave my house! I am disabled, and suffer from heart issues."

e.  A collector repeatedly called a consumer at work demanding payment on a loan that did not belong to her, and "[i]f I refuse they will have police arrest me... [They] have repeat[ed]ly called my job with threats and cursing me when I refuse to give them my card info. My employer is threaten[ing] to relieve me due to constant calling from this company."

149.   From at least 2015 to 2017, consumers whose debt was sold by UDH, or placed for collection by UDH, complained that collectors from multiple Debt Collectors used by UDH made implied and express representations that the consumers were imminently going to face criminal charges, be arrested, or face jail

time if the consumers could not pay their debts immediately.  These

representations were false because these were not debts for which nonpayment

would result in any of these consequences.

## Defendants' Knowledge of Violations

150.  Since 2015, Defendants have received hundreds of complaints from

consumers that Debt Collectors collecting on debt placed by Defendants or sold by

Defendants have made express or implied misrepresentations that (a) consumers

would face arrest, jail, or lawsuits imminently if they did not pay their debts, or (b)

consumers' credit reports would improve if they paid their debts or would be

affected negatively if they did not pay their debts.

151.  Many of the complaints were forwarded to Defendants from the

creditors that originally sold the debt portfolios.

152.  When Defendants received these complaints, they often forwarded

them to the Debt Collector serving as master servicer or to the Debt Collectors

referenced in the complaints.

153.  Defendants also received recorded collection calls with consumers

from placement Debt Collectors in which the Debt Collectors were falsely

threatening lawsuits and making false statements about credit reporting.

154.  Because of their roles managing UDH, JTM, or UHG, including roles

in compliance and resolving escalated consumer complaints, Manseth, Turco, and

Adamo knew or should have known about the false threats of litigation and false statements about credit reporting made by the Debt Collectors referenced in Paragraphs 135-139 and 144-146.

155.   Yet Defendants continued placing debt with and, in some instances, selling debt to the Debt Collectors referenced in Paragraphs 135-139 and 144-146 after receiving evidence of the violations.

156.   UDH, JTM, and UHG did not take meaningful action to prevent or preclude further false statements, and the Defendants for the most part continued doing business as usual with these Debt Collectors.

157.   Because of his role managing UDH, including his involvement in resolving escalated consumer complaints, Manseth knew or should have known about the false arrest or jail threats made by the Debt Collectors referenced in Paragraphs 147 and 149.

158.   UDH took no meaningful action to prevent or preclude false statements by Debt Collectors and for the most part, UDH and Manseth continued to do business as usual with Debt Collectors after consumers complained about jail threats.

159.   Defendants continued to allow the Debt Collectors referenced in Paragraphs 135-139, 144-146, 147, and 149 to collect from thousands of consumers on debt that had been placed or sold by Defendants and continued to

benefit financially by seeking and accepting payments from these Debt Collectors for years after receiving evidence of the violations.

160.    Several of the Debt Collectors that collected debt on behalf of Defendants or that the Defendants sold debt to were sued by state and federal regulators between 2015 and 2017 for deceiving consumers, including by making false threats of arrest, criminal prosecution, and lawsuits to collect debt from consumers.

161.    On several occasions, when original creditors received complaints or contacted Defendants to check on Debt Collectors' compliance with debt-collection laws, one or more of the Defendants concealed violations, including by telling their Debt Collectors to supply only legally-compliant calls for audits and declining to give original creditors call notes or phone call recordings in Defendants' possession.

162.    Defendants have claimed at various times that they terminated relationships with Debt Collectors that have been subject of multiple complaints.

163.    Yet Defendants' internal records indicate that Defendants knew or should have known that thousands of debts they owned were still being placed with and sold to the Debt Collectors they claimed to have terminated.

164.    In some instances, the Debt Collectors changed their names and continued collecting debts on Defendants' behalf. In other instances, Defendants

knew or should have known that their master servicers passed debt to Debt Collectors referenced in Paragraph 162.

165.   In some instances, UDH terminated relationships with Debt Collectors due to compliance concerns but JTM or UHG later began working with those same Debt Collectors.

### COUNT I
*Against All Defendants*
*CFPA: False Threats of Lawsuits and False Statements About Credit Reporting*

166.   The Bureau realleges and incorporates by reference Paragraphs 1–165 of this Complaint.

167.   Section 1036(a)(1)(B) of the CFPA prohibits a "covered person" from engaging in deceptive acts or practices. 12 U.S.C. § 5536(a)(1)(B).

168.   Defendants represented, expressly or impliedly, through Debt Collectors with which Defendants placed debt and their downstream Debt Collectors, that consumers would be sued if they did not settle their debts now or that repaying (or not repaying) the debt would affect their credit score.

169.   In fact, Defendants had not authorized these Debt Collectors to sue consumers about these debts, and Defendants did not intend to sue these consumers imminently. Further, UDH, JTM, UHG, the Debt Collectors did not furnish information on the debts to consumer-reporting agencies.

170.   Misrepresentations about impending lawsuits or the effect of payment

(or nonpayment) on a consumer's credit score are material to a consumer's decision about when or if to pay a debt and are likely to mislead a consumer acting reasonably under the circumstances.

171.   Defendants controlled, directed, and benefitted from the debt-collection conduct of these Debt Collectors.

172.   Defendants, acting through Debt Collectors with which they had placed consumer debt and their downstream Debt Collectors, have violated 12 U.S.C. § 5536(a)(1)(B).

## COUNT II
*Against All Defendants*
*Substantially Assisting Violations of the CFPA: Placement and Sale of Debt with Debt Collectors That Made False Threats of Lawsuits and False Statements about Credit Reporting*

173.   The Bureau realleges and incorporates by reference Paragraphs 1-165 of this Complaint.

174.   Debt Collectors with which UDH, JTM, or UHG directly or indirectly placed debt, Debt Collectors to which UDH, JTM, or UHG sold debt, and downstream Debt Collectors are "covered persons" engaged "in offering or providing a consumer financial product or service" because they collected debt related to extensions of credit. 12 U.S.C. § 5481(6), (15)(A)(x).

175.   Debt Collectors with which UDH, UHG, or JTM directly or indirectly placed debt, Debt Collectors to which UDH, UHG, or JTM sold debt, and

downstream Debt Collectors engaged in deceptive acts and practices by falsely threatening consumers with impending lawsuits or falsely telling consumers that repaying (or not repaying) the debt would affect their credit score.

176.   Misrepresentations about impending lawsuits or the effect of payment (or nonpayment) on a consumer's credit score are material and are likely to mislead a consumer acting reasonably under the circumstances.

177.   Debt Collectors engaged in deceptive acts or practices that violate 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

178.   The Individual Defendants, acting through UDH, JTM, and UHG, at times directly participated in placing or selling portfolios and had the authority to control placements or sales.

179.   The Individual Defendants, acting through UDH, JTM, and UHG, used Debt Collectors to collect on their debt despite these Debt Collectors' continued deceptive statements to consumers.

180.   Each of the Individual Defendants actively managed the day-to-day operation of UDH, JTM, or UHG, and handled escalated compliance issues and escalated consumer complaints for at least one of the corporate Defendants.

181.   Because the Defendants knew or should have known of the deceptive acts and practices of the Debt Collectors and continued to place or permit placement of debt directly or indirectly with them or continued to sell or permit

sales of portfolios to them, they knowingly or recklessly substantially assisted these Debt Collectors' conduct and have violated the CFPA, 12 U.S.C. § 5536(a)(3).

## COUNT III
*Against UDH and Manseth*
*Substantially Assisting Violations of the CFPA: Placement and Sale of Debt to Debt Collectors and Buyers That Made False Threats of Arrest*

182.   The Bureau realleges and incorporates by reference Paragraphs 1–165 of this Complaint.

183.   From at least 2015 to 2017, UDH directly or indirectly placed debt with and sold debt to Debt Collectors that committed deceptive acts or practices by falsely threatening consumers with criminal charges, arrest, or jail time.

184.   These Debt Collectors' deceptive acts or practices violated 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

185.   Manseth directly participated in placing and selling debt portfolios and handling escalated compliance issues and escalated consumer complaints for UDH.

186.   Because Manseth and UDH knew or should have known that Debt Collectors were engaging in deceptive acts and practices by making false threats of criminal charges, arrest, or jail time and continued to place or permit placement of debt directly or indirectly with them or continued to sell or permit sales of portfolios to them, Manseth and UDH knowingly or recklessly substantially

assisted the Debt Collectors' conduct, and have violated the CFPA, 12 U.S.C. § 5536(a)(3).

## COUNT IV
*Against JTM and UHG*
*FDCPA: False Threats of Lawsuits and False Statements About Credit Reporting*

187.   The Bureau realleges and incorporates by reference Paragraphs 1–165 of this Complaint.

188.   JTM and UHG are each "debt collectors" under the FDCPA. 15 U.S.C. § 1692a(6).

189.   Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any debt.

190.   Section 807(5) of the FDCPA, 15 U.S.C. § 1692e (5), specifically prohibits debt collectors from making threats to take any action that cannot legally be taken or that is not intended to be taken.

191.   Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10), specifically prohibits debt collectors from using false representations or deceptive means to collect or attempt to collect any debt.

192.   Section 807(13) of the FDCPA, 15 U.S.C. § 1692e(13) prohibits debt collectors from falsely representing or implying that documents are legal process.

193.   In collecting and attempting to collect debts from consumers, JTM

and UHG represented expressly or impliedly, through placement Debt Collectors or their downstream Debt Collectors, that consumers would be sued if they did not settle their debts now or that consumers' credit scores would be affected by the payment (or nonpayment) of the debt.

194.    In fact, JTM and UHG had not authorized these Debt Collectors to sue consumers about these debts, and JTM and UHG did not intend to sue these consumers imminently. Further, JTM, UHG, and the Debt Collectors did not furnish information on the debts to consumer-reporting agencies.

195.    These representations were false and misleading and constitute deceptive practices under § 807 of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(5), 1692e(10), 1692e(13).

### COUNT V
*Against JTM and UHG*
*Violations of the CFPA Arising from FDCPA Violations*

196.    The Bureau realleges and incorporates by reference Paragraphs 1–165 of this Complaint.

197.    Section 1036(a)(1)(A) of the CFPA provides that it is "unlawful for . . . any covered person or service provider . . . to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

31

198.   Because JTM and UHG are "covered persons" who violated the FDCPA, they also violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## DEMAND FOR RELIEF

199.   Wherefore, the Bureau, pursuant to §§ 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, requests that the Court:

a.   permanently enjoin Defendants from committing future violations of the CFPA, the FDCPA, or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b.   grant additional injunctive relief as the Court may deem to be just and proper;

c.   award damages and other monetary relief against Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA and the FDCPA, including but not limited to rescission or reformation of contracts, restitution, and the refund of monies paid;

d.   order disgorgement of Defendants' ill-gotten gains;

e.   award civil money penalties;

f.   award the costs of bringing this action; and

g.  award additional relief as the Court may determine to be just and

proper.


Dated: January 10, 2022                    Respectfully submitted,

Eric Halperin
*Enforcement Director*
James T. Sugarman
*Assistant Litigation Deputy*

/s/ Lindsay Castanien
Lindsay Castanien
Vanessa Buchko
Stephanie Brenowitz
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Castanien): 202-435-9372
Telephone (Buchko): 202-435-9593
Telephone (Brenowitz): 202-435-9005
Fax: 202-435-7722
E-mail: Lindsay.Castanien@cfpb.gov
E-mail: Vanessa.Buchko@cfpb.gov
E-mail: Stephanie.Brenowitz@cfpb.gov
*Attorneys for Consumer Financial*
        *Protection Bureau*