UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CONSUMER FINANCIAL PROTECTION
BUREAU,

                Plaintiff,

     v.

CRAIG MANSETH, *et al.*,

                Defendants.

_____

22-CV-29-LJV
DECISION & ORDER

On January 10, 2022, the Consumer Financial Protection Bureau ("CFPB")

commenced this action against United Debt Holding LLC ("UDH"); JTM Capital

Management, LLC ("JTM"); UHG, LLC ("UHG")[1]; and three executives of those

companies: Jacob Adamo, Craig Manseth, and Darren Turco.  *See* Docket Item 1

(complaint); *see also* Docket Item 16 (amended complaint).  The CFPB alleges that

UDH, JTM, and UHG violated the Consumer Financial Protection Act ("CFPA") and the

Fair Debt Collection Practices Act ("FDCPA") by purchasing defaulted consumer debt

and then placing that debt with, or selling that debt to, debt collection companies that

"used threats and misrepresentations to coerce payments from consumers."  *See*

Docket Item 16 at ¶¶ 2, 169-201.  The CFPB also says that Manseth, Adamo, and

Turco, as executives of UDH, JTM, and UHG, are liable for the companies' unlawful

conduct.  *See id.* at ¶ 3.

_____

[1] The CFPB brings claims against UHG, LLC; UHG I LLC; and UHG II LLC.
Docket Item 16.  The parties do not argue that the UHG corporate structure has any
relevance to the CFPB's claims, so the Court—like the parties, *see id.* at 1; Docket Item
30-1 at 10 & n.1—refers to the UHG entities collectively as UHG.

After the CFPB amended its complaint, *see* Docket Item 16, the defendants moved to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Docket Items 30 and 31.  On April 21, 2022, the CFPB responded to the motions to dismiss, Docket Item 37, and about three weeks later, the defendants replied, Docket Items 40 and 41.  The CFPB then asked for leave to file a sur-reply to address arguments raised in the defendants' reply briefs, *see* Docket Item 42, and the defendants opposed that motion, Docket Item 44.

On January 12, 2023, this Court heard oral argument on the motions to dismiss. Docket Item 50.  At oral argument, the Court granted the CFPB's motion for leave to file a sur-reply and accepted the defendants' response to that motion as a sur-sur-reply. *See id.*  The parties then submitted additional briefing on whether vicarious liability is available under the CFPA.  Docket Items 52, 55, 56.

For the reasons that follow, the defendants' motions to dismiss are denied.

## FACTUAL BACKGROUND[2]

## I.    UDH, JTM, AND UHG

UDH, JTM, and UHG are limited liability companies that purchase defaulted consumer debt.  Docket Item 16 at ¶ 1.  Although UDH, JTM, and UHG now "operate[]

---

[2] The following facts are taken from the amended complaint, Docket Item 16.  On a facial challenge to standing under Rule 12(b)(1), as on a motion to dismiss under Rule 12(b)(6), a court "accept[s] as true all material factual allegations of the complaint" and "draw[s] all reasonable inferences in favor of the plaintiff."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016) (citations and internal quotation marks omitted); *see also Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

as a single entity," *see id.* at ¶ 125, the three companies initially were distinct, *see id.* at ¶¶ 111-12.

UDH, JTM, and UHG all employ the same basic business model:  The companies purchase "portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance" and "then place[] the portfolios with or s[ell] them to other" debt collection companies.  *Id.* at ¶¶ 16, 29, 45.  The debt collectors with whom the debt is placed or to whom it is sold then collect the debt on the defendant-companies' behalf.  *Id.* at ¶¶ 17, 30, 46.  And those placement debt collectors sometimes placed debts with other companies, who then would collect on UDH's, JTM's, or UHG's behalf.[3]  *Id.* at ¶ 127.

### A.     UDH

Manseth founded UDH in 2008, and he served as its Chief Executive Officer and President.  *Id.* at ¶¶ 56-57.  Turco served as UDH's Executive Vice President, "where he reported to Manseth and assisted with managing compliance issues relating to debt collectors."  *Id.* at ¶ 87.

"Beginning in or before 2014, UDH's primary lines of business were placing consumer debt with and selling consumer debt to" other debt collection companies.  *Id.* at ¶ 98.  In some cases, UDH would "place[] its debt with debt collectors called 'master servicers,' who then placed it with other debt collectors that collected the debts on

---

[3] The amended complaint refers to those debt collectors as "downstream debt collectors."  *See, e.g.*, Docket Item 16 at ¶ 147 (capitalization removed).

UDH's behalf and with UDH's knowledge."[4]  *Id.* at ¶ 99.  Those collectors and master servicers would "remit a percentage of the amount collected from each consumer to UDH."  *Id.* at ¶ 100.  "UDH also sold debt to debt collectors and entered into agreements with some debt collectors that required the debt collectors to make ongoing payments to UDH."  *Id.* at ¶ 101.  "UDH had the authority to repurchase or recall any debts, to terminate its contracts with any sub-agencies, and to stop master servicers from placing any UDH debt with specific debt collectors due to compliance concerns, at any time."  *Id.* at ¶ 102.

### B.    JTM

One such "master servicer" with whom UDH placed debts was JTM.  UDH began working with JTM as a "master servicer" in 2015.  *Id.* at ¶ 103.  Adamo founded JTM, and he has had managerial responsibility over JTM since 2014.  *Id.* at ¶¶ 73-74.  Adamo also "monitored debt collectors' activities and compliance, which included handling escalated complaints" about those collectors.  *Id.* at ¶ 75.

According to the CFPB, however, JTM did not always comply with federal consumer protection laws.  In fact, "[f]rom 2015 through January 2017, UDH's compliance staff reviewed recorded phone calls from JTM's debt collectors and found that many contained major violations of the FDCPA or the CFPA's prohibition against unfair, deceptive, or abusive acts and practices."  *Id.* at ¶ 105.  And UDH received complaints in 2015 and 2016 "from consumers whose accounts were placed by or with

---

[4] Unless otherwise noted, all capitalization has been removed from the citations to the amended complaint.

JTM, complaining that they had been threatened with arrest, jail, or a lawsuit if they did not pay."  *Id.* at ¶ 106.

Although UDH's compliance officer "told Manseth and Turco that UDH should stop using JTM" as a master servicer, UDH instead "increased its reliance on JTM to collect its debts."  *Id.* at ¶¶ 107-08.  By 2017, UDH "was using JTM almost exclusively as its master servicer," and UDH "placed more than 380,000 accounts with JTM."  *Id.* at ¶ 109.  UDH continued to use JTM as a master servicer "through mid-2018."  *Id.* at ¶ 110.

### C.    UHG

In May 2017, Adamo, Manseth, and Turco founded UHG.  *Id.* at ¶ 111.  Soon after that, UDH and JTM "began transitioning nearly all aspects of their business to UHG."  *Id.* at ¶ 112.  UDH and JTM both "signed [] written agreement[s]" with UHG that "obligat[ed] UHG to handle all or almost all of [UDH's and JTM's] business affairs in exchange for all or most of the profit derived from [them]."  *Id.* at ¶¶ 113-14.

Although UDH and JTM were at that point folded into UHG, the CFPB says that UHG retained much of JTM's and UDH's internal structure and business.  JTM and UDH employees "became employees of UHG," and UHG took over JTM's and UDH's office space.  *Id.* at ¶¶ 117-18.  UHG "continued to use the same policies and procedures as UDH," as well as "the same technology, the same software systems, and the same vendors pursuant to the same contracts as UDH."  *Id.* at ¶¶ 121-22.  UHG also "continued to use JTM's and UDH's portfolios, consumer data, account details, and performance statistics to obtain new financing and business[] and to collect on existing portfolios."  *Id.* at ¶ 123.  And UHG "continued to use the same complaints-management

system as JTM and UDH." *Id.* at ¶ 124.  Since JTM, UDH, and UHG joined together, the three companies "have operated as a single entity under the control of" Adamo, Manseth, and Turco.  *Id.* at ¶ 125.

## II.   THE DEBT COLLECTORS

As noted above, UDH, JTM, and UHG share similar business models, and each "contracted with debt collectors to collect debt on [their] behalf . . ., either directly or through another debt collector." *Id.* at ¶ 127.  "UDH, JTM, and UHG provided the debt collectors collecting on their behalf with consumers' contact information, personal identifying information, and account details related to the debt the consumers allegedly owed." *Id.* at ¶ 128.  The debt collectors then would use that information to contact the consumers and attempt to collect the unpaid debts.  *Id.* at ¶¶ 129-30.  And the debt collectors would "remit[] a percentage of the amount collected from each consumer to UDH, JTM, and UHG, pursuant to their agreements" with the three companies.  *Id.* at ¶ 133.

UDH, JTM, and UHG all "provided written guidance to the debt collectors," which "required certain conduct standards, audits, testing, and training of staff." *Id.* at ¶ 135. Moreover, UDH, JTM, and UHG—as well as Adamo, Manseth, and Turco—all "had the authority to instruct debt collectors about how to handle consumer complaints, whether to discipline collection employees, and how to change collection behavior." *Id.* at ¶ 136. The defendants also "had the authority to remove accounts from debt collectors and to refuse to send additional accounts to debt collectors." *Id.* at ¶ 137.

Those debt collection companies did not always use lawful tactics to collect on the unpaid debt, however.  In fact, UDH, JTM, and UHG placed debts with debt

collectors that falsely told consumers that they would be sued for the unpaid debts. *Id.* at ¶¶ 138-46. Those collectors would, for example, tell consumers that their calls were the "final step before 'the client' would file suit" or would represent that the consumers' "status or account was pre-legal, in mediation, or in arbitration." *Id.* at ¶¶ 139, 141-42. But "[n]one of the debt collectors . . . were authorized by UDH, JTM, or UHG to sue consumers"; none of the debt collectors in fact sued consumers; and UDH, JTM, and UHG had no "imminent plan[s] to sue the consumers threatened by the debt collectors when the[] statements were made." *Id.* at ¶¶ 144-46.

What is more, "[s]ome of the debt collectors with wh[om] UDH, JTM, or UHG placed debt, or their downstream debt collectors, made representations that consumers' credit scores or credit histories would be impacted positively if they paid the debt or, conversely, would be impacted negatively if they did not pay the debt." *Id.* at ¶ 147. But "UDH, JTM, and UHG did not furnish information to credit-reporting agencies regarding the[ consumers'] debts," and the debt collectors likewise did not supply that information to credit agencies. *Id.* at ¶¶ 148-49.

Finally, UDH, JTM, and UHG placed debt with, or sold debt to, debt collectors that "made express or implied misrepresentations that consumers would be arrested, jailed, or face criminal charges if they did not pay their debts." *Id.* at ¶ 150. In fact, since 2015, the defendants "received complaints from more than 500 consumers" that those debt collectors falsely threatened consumers with arrest or criminal charges. *Id.*

Not only did UDH, JTM, and UHG receive complaints from consumers about the debt collectors' unlawful practices, but they also "received recorded collection calls with consumers from placement debt collectors in which the debt collectors were falsely

threatening lawsuits and making false statements about credit reporting." *Id.* at ¶ 156. Nevertheless, none of the three companies "t[ook] meaningful action to prevent or preclude" the debt collectors from making "further false statements." *Id.* at ¶ 159. In fact, UDH, JTM, and UHG "continued placing debt with and, in some instances, selling debt to the debt collectors . . . after receiving evidence of the violations." *Id.* at ¶ 158. And the defendants "continued to benefit financially by seeking and accepting payments from" the offending debt collectors "for years after receiving evidence of the violations." *Id.* at ¶ 162.

Sometimes, the original creditors of the defaulted debts would "contact[ the] defendants to check on [the] debt collectors' compliance with debt-collection laws." *Id.* at ¶ 164. When that happened, "one or more of the defendants concealed violations, including by telling their debt collectors to supply only legally[ ]compliant calls for audits and declining to give original creditors call notes or phone call recordings in [the] defendants' possession." *Id.* Moreover, the defendants would "claim[] at various times that they terminated relationships with debt collectors that have been [the] subject of multiple complaints" even though the defendants' "internal records indicate[d] that . . . thousands of debts they owned were still being placed with and sold to the debt collectors they claimed to have terminated." *Id.* at ¶¶ 165-66.

## LEGAL PRINCIPLES

### I.    SUBJECT MATTER JURISDICTION

"'A district court properly dismisses an action under [Federal Rule of Civil Procedure] 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it,' such as when 'the plaintiff lacks constitutional

standing to bring the action.'" *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021) (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 416-17 (2d Cir. 2015)).  "[A] plaintiff asserting standing must 'allege facts that affirmatively and plausibly suggest that it has standing to sue[,]' and courts 'need not credit a complaint's conclusory statements without reference to its factual context.'" *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145-46 (2d Cir. 2011)).

## II.     FAILURE TO STATE A CLAIM

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "[A]lthough 'a court must accept as true all of the allegations contained in a complaint,' that tenet 'is inapplicable to legal conclusions,' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

**DISCUSSION**

I.    **SUBJECT MATTER JURISDICTION**

The defendants first argue that the CFPB lacks standing to pursue its claims.

*See* Docket Item 30-1 at 12-20; Docket Item 31-1 at 13-23.  Because "[s]ubject matter

jurisdiction is a threshold question that must be resolved before proceeding to the

merits," *see United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (alterations,

citation, and internal quotation marks omitted), the Court first addresses whether it has

jurisdiction.  For the reasons that follow, it does.

"For there to be a case or controversy under Article III" of the Constitution, a

plaintiff "must have a personal stake in the case—in other words, standing."

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citation and internal

quotation marks omitted).  The "irreducible constitutional minimum of standing contains

three elements": (1) "the plaintiff must have suffered an 'injury in fact'—an invasion of a

legally protected interest which is (a) concrete and particularized, and (b) actual or

imminent, not conjectural or hypothetical"; (2) "the injury has to be fairly traceable to the

challenged action of the defendant"; and (3) "it must be likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision."[5]   *Lujan v. Defs. of*

---

[5] The defendants argue that the CFPB lacks standing because the defendants
are not covered by the CFPA and the CFPB has not shown that it was injured by their
conduct.  *See* Docket Item 30-1 at 12-14; Docket Item 31-1 at 14-18.  But for the
reasons stated below, *see infra* at 17-20, the Court concludes that the defendants are
"covered persons" under the CFPA.  And when enforcing the CFPA, "the Executive
Branch, through the CFPB, need not suffer a 'particularized injury'" to satisfy Article III
standing because "it is charged under Article II to enforce federal law."  *CFPB v.
Gordon*, 819 F.3d 1179, 1188 (9th Cir. 2016).  Moreover, whether the CFPB has
adequately alleged its claims, including whether the defendants are covered by the
CFPA, goes to the substantive viability of those claims, not this Court's jurisdiction to
hear them.  *See CFPB v. Nat'l Collegiate Master Student Loan Tr.*, 2021 WL 1169029,

*Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations, citations, and internal quotation marks omitted).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Id.*

A.    **Traceability**

The defendants argue that the CFPB lacks standing because the allegations in the second amended complaint hinge on the actions of third parties not before the Court.  *See* Docket Item 30-1 at 14-16; Docket Item 31-1 at 21-23.  In other words, the defendants say that any injury is traceable to the debt collectors that made the allegedly unlawful calls, not to the defendants.  *See* Docket Item 30-1 at 14-16; Docket Item 31-1 at 21-23.

To establish the necessary "causal connection between the injury and the conduct complained of," the claimed injury "has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (alterations, citation, and internal quotation marks omitted).  But that requirement "does not create an onerous standard"; in fact, the standard is "lower than [the standard] of proximate causation."  *Carter*, 822 F.3d at 55.

---

at *4 (D. Del. Mar. 26, 2021) (concluding that "the term 'covered persons'" under the CFPA "is not jurisdictional").

The defendants also challenge the legal deficiencies of the CFPB's claims in arguing that the CFPB lacks standing.  For example, the defendants say that the mere receipt of consumer complaints does not establish liability; that the CFPB has not adequately identified the offending debt collectors; and that the CFPB's claims are insufficiently pleaded.  *See* Docket Item 30-1 at 15-16; Docket Item 31-1 at 22-23.  But again, those contentions address the merits of the CFPB's claims, not whether it has standing to assert them.  Furthermore, for the reasons stated below, those purported deficiencies do not warrant dismissal here.

So "[a] defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may" still "suffice for Article III standing." *Id.* at 55-56. And "at the pleading stage of the litigation, the plaintiff['s] burden of alleging that [its] injury is fairly traceable to the challenged act is relatively modest." *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (alterations, citation, and internal quotation marks omitted).

The amended complaint alleges that the defendants violated the CFPA by placing debts for collection with companies that falsely threatened litigation and that misrepresented the effect that repayment would have on the consumers' credit scores. *See* Docket Item 16 at ¶¶ 169-84. The amended complaint also says that UDH and Manseth violated the CFPA by placing debts with, or selling debts to, debt collectors that falsely threatened consumers with arrest. *See id.* at ¶¶ 185-89. And the amended complaint alleges that UHG and JTM violated the FDCPA, and in turn the CFPA, by placing debts with companies that falsely threatened litigation and misrepresented the effect of repayment on the consumers' credit scores. *See id.* at ¶¶ 190-201.

Although the allegedly offending calls were not placed by the defendants themselves, the amended complaint alleges that "UDH, JTM, and UHG provided written guidance to the debt collectors," which included information about "certain conduct standards" and "training of staff." *See id.* at ¶ 135. And the amended complaint says that even after the defendants received notice that the debt collectors were violating the law, they continued to place debts with the offending companies. *See id.* at ¶¶ 153-68. In fact, according to the amended complaint, the defendants took steps to conceal the debt collectors' unlawful conduct, including by "supply[ing] only legally[ ]compliant calls

for audits and declining to give original creditors call notes or phone call recordings in [the] defendants' possession."  *Id.* at ¶ 164.

In other words, the amended complaint says that the offending calls were made by debt collectors who were collecting debt under the defendants' control and guidance. And the amended complaint says that the defendants failed to act after receiving notice that the debt collectors were violating the law.  The CFPB's claims therefore do not hinge on "the independent action of some third party not before the court," *see Lujan*, 504 U.S. at 560; instead, the claimed injury is traceable to the defendants because the defendants allegedly instructed—or at least enabled—the unlawful conduct of the debt collectors.  So even though that injury involves "intervening conduct" by the debt collectors who made the unlawful calls, it still is sufficiently traceable to the defendants. *See Carter*, 822 F.3d at 55-56; *see also Rothstein*, 708 F.3d at 92 (noting that "it is 'wrong' to 'equate injury fairly traceable to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation'" (alterations and internal quotation marks omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997))).

### B.    Injunctive and Monetary Relief

A plaintiff "must demonstrate standing for each claim that [it] press[es] and for each form of relief that [it] seek[s] (for example, injunctive relief and damages)." *TransUnion*, 141 S. Ct. at 2208.  "Therefore, a plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages," and vice versa.  *See id.* at 2210.

Under the CFPA, the CFPB may seek "all appropriate legal and equitable relief[,] including a permanent or temporary injunction," for violations of federal consumer financial laws. 12 U.S.C. § 5564(a). And the CFPA further provides that the CFPB may seek restitution, disgorgement, "payment of damages[,] or other monetary relief." *Id.* § 5565(a)(2).

The defendants argue that the CFPB has not adequately demonstrated that it has standing to pursue injunctive or monetary relief. Docket Item 30-1 at 16-20; Docket Item 31-1 at 18-20. They say that the CFPB cannot seek injunctive relief because it has not shown any possible risk of future violations. *See* Docket Item 30-1 at 16-19; Docket Item 31-1 at 19-20. And they say that the CFPB has not shown how any consumers were financially harmed by any conduct alleged in the amended complaint and therefore lacks standing to seek monetary relief, including restitution or disgorgement. *See* Docket Item 30-1 at 19-20; Docket Item 31-1 at 18-19.

The amended complaint alleges that UDH, JTM, and UHG placed debts with debt collection companies that falsely threatened debtors with litigation and misrepresented the effect that payment would have on credit scores. *See* Docket Item 16 at ¶¶ 138-49. The amended complaint also alleges that Adamo, Manseth, and Turco hold senior positions at UHG; that Manseth and Turco held and continue to hold senior positions at UDH; and that Adamo held and continues to hold a senior position at JTM. *See id.* at ¶¶ 55-96. And the amended complaint does not allege that JTM and UDH have ceased operations or dissolved; on the contrary, it says that "UDH, JTM, and UHG have operated as a single entity under the control of [Adamo, Manseth, and Turco] since at least mid-2017." *Id.* at ¶ 125.

So the CFPB has alleged that UDH, JTM, and UHG, under the control of the individual defendants, committed similar violations of the CFPA and the FDCPA and that all three companies continue to operate even after their combination.  This is therefore not a case where a corporate entity cannot be enjoined from violating the law because it is "no longer a viable operating entity."  *EEOC v. Everdry Mktg. & Mgmt., Inc.*, 348 F. App'x 677, 679 (2d Cir. 2009) (summary order).  Instead, it is a case where at the very least the defendants' "current occupations would enable them to restart the [offending] practice[s]."  *See CFPB v. Howard*, 2017 WL 10378953, at *5 (C.D. Cal. May 30, 2017) (denying motion to dismiss claim for injunctive relief despite the defendants' "assert[ions that] they ceased their debt relief practice over a year ago" (internal quotation marks omitted)).  The CFPB therefore has adequately alleged that it has standing to pursue injunctive relief.

The CFPB likewise has adequately alleged that it has standing to pursue monetary relief, including restitution and disgorgement.  The amended complaint alleges that UDH, JTM, and UHG placed debts with debt collectors that used various unlawful means to collect those debts.  *See* Docket Item 16 at ¶¶ 138-52.  Those debt collectors, in turn, "remitted a percentage of the amount collected from each consumer to UDH, JTM, and UHG, pursuant to their agreements."  *See id*. at ¶ 133.  What is more, the CFPB says that the defendants "allow[ed] the debt collectors" that engaged in those unlawful practices "to collect from thousands of consumers" and "continued to benefit financially by seeking and accepting payments from the[ offending] debt collectors."  *Id*. at ¶ 162.

Based on that overarching scheme, it is plausible to infer that the defendants received payments from debt collectors that used unlawful means to collect the debts. *See generally John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) ("When the defendant asserts a 'facial' challenge to standing, [] it remains the case that courts should continue to draw from the pleadings all reasonable inferences in the plaintiff's favor and are to presume that general allegations embrace those specific facts that are necessary to support the claim." (alterations, citation, and internal quotation marks omitted)).  Likewise, it is reasonable to assume that those payments came from money paid by debtors who were victims of the unlawful debt collection practices. Because the CFPB has adequately alleged that its claims are redressable by monetary relief, including restitution and disgorgement, the CFPB has standing to pursue that relief.[6]

---

[6] UHG and the individual defendants also ask the Court to strike the CFPB's claims for injunctive and monetary relief under Federal Rule of Civil Procedure 12(f). Docket Item 30-1 at 43-44.  Rule 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Although UHG and the individual defendants say that the CFPB's claims for injunctive or monetary relief are "immaterial and impertinent," Docket Item 40 at 22, they actually challenge the sufficiency of the CFPB's allegations, *see* Docket Item 30-1 at 43 (contending that the CFPB's requested relief "should be stricken in light of the [amended] complaint's paucity of facts").  But Rule 12(f) is not a vehicle for "dismiss[ing] some or all of a" complaint.  *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380 (3d ed.) ("[Rule 12(f)] is neither an authorized nor a proper way to procure the dismissal of all or a part of a complaint . . . .").  Because UHG's and the individual defendants' request to strike actually tests the legal merits of the CFPB's requests for relief, it is not properly brought under Rule 12(f) and is denied.

## II.     FAILURE TO STATE A CLAIM

Because the CFPB has adequately alleged that it has standing to bring this suit, the Court turns next to the defendants' motions to dismiss under Rule 12(b)(6).  The defendants lob a host of challenges at the amended complaint, including that they are not covered by the CFPA; that the FDCPA and CFPA do not allow for vicarious liability; that the CFPB's claims are time barred; and that, in any event, the CFPB's claims are substantively inadequate.  For the reasons that follow, the Court concludes that the CFPB's claims survive the defendants' challenges.

### A.     CFPA-Based Claims (Counts One, Two, and Three)

#### 1.     Whether the Defendants Are "Covered Persons" Under the CFPA

As an initial matter, the defendants argue that they are not covered by the CFPA. That is, the defendants maintain that only the third-party debt collectors actually collected debts and that UDH, JTM, and UHG, as well as the individual defendants, therefore are not "covered persons" or "related persons" under the CFPA.  *See, e.g.*, Docket Item 30-1 at 13; Docket Item 41 at 8-12.  In *Consumer Financial Protection Bureau v. National Collegiate Master Student Loan Trust*, 575 F. Supp. 3d 505 (D. Del. 2021) (Bibas, J.), United States Court of Appeals Judge Stephanos Bibas, sitting by designation, considered a similar question—whether a company "engage[s] in an activity," and therefore could be covered by the CFPA, when "[it] contracts with a third party to do that activity on [its] behalf."  *Id.* at 509 (internal quotation marks omitted). And for reasons similar to those given by Judge Bibas, the Court concludes that the answer to that question is yes.

Like Judge Bibas, *see id.*, this Court will start with the text.  Under the CFPA, a

"covered person" is "any person that engages in offering or providing a consumer

financial product or service" and "any affiliate of [that person] if such affiliate acts as a

service provider to such person."[7]  12 U.S.C. § 5481(6).  The CFPA provides a list of

"[f]inancial product[s] or service[s]," such as "extending credit and servicing loans,

including acquiring, purchasing, selling, brokering, or other extensions of credit (other

than solely extending commercial credit to a person who originates consumer credit

transactions)" and "collecting debt related to any consumer financial product or service."

*Id.* § 5481(15)(A)(i), (15)(A)(x).  Combining those definitions, a "covered person"

therefore includes "any person that engages in offering or providing . . . collecting debt

related to any consumer financial product or service."[8]  *Id.* § 5481(6), (15)(A)(x).

As Judge Bibas noted, an entity can "engage in" an activity even if another entity

acts on the first entity's behalf:  "'Engage' means 'to embark in any business' or to 'enter

upon or employ oneself in an action,'" which is "broad enough to encompass actions

taken on a person's behalf by another."  *Nat'l Collegiate Master Student Loan Tr.*, 575

F. Supp. 3d at 509 (quoting *Engage*, Oxford English Dictionary (2d ed. 2000)).  It would

strain ordinary understanding to say that a company is not engaged in collecting debt

---

[7] A "person" under the CFPA is "an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity."  12 U.S.C. § 5481(19).  The defendants do not dispute that they are covered by that list.

[8] Because the Court finds that UDH, JTM, and UHG engage in "collecting debt related to any consumer financial product or service," *see* 12 U.S.C. § 5481(6), (15)(A)(x), it need not, and does not, address whether UDH, JTM, and UHG also are "covered persons" because those companies engage in "extending credit and servicing loans," *see id.* § 5481(6), (15)(A)(i).

when it purchases defaulted debt, places that debt with other companies for collection, and then receives some of the money recovered by those debt collectors.  *See, e.g.*, Docket Item 16 at ¶¶ 127-33.  If that company does not "engage in" collecting debt, the Court would be hard-pressed to describe what exactly the company does engage in.

And nothing in the text of the CFPA supports the defendants' narrow reading. The defendants argue that because the Supreme Court has rejected the "series-qualifier principle"[9] when interpreting other statutes, the phrase "engages in" modifies only "offering or providing," not the entire list of "[f]inancial product[s] or service[s]" that is enumerated in 12 U.S.C. § 5481(15)(A).  *See* Docket Item 41 at 9 (citing *Lockhart v. United States*, 577 U.S. 347, 352 (2016)).  It is unclear what interpretive weight the defendants place on that rule of construction or why that rule even applies here.  There is no "series" in the provision at issue; rather, the provision defines "covered person" as one who "engages in offering or providing a consumer financial product or service" enumerated elsewhere in the statute.  *See* 12 U.S.C. § 5481(6), (15)(A).  So even if, as the defendants argue, "engages in" modifies only "offering or providing" a product or service, *see* Docket Item 41 at 9, that would be of no moment since the products and services to which that definition applies are listed not in a series following the modifier, but in another provision entirely.

Moreover, it is unclear how exactly this Court should interpret the statute even under the defendants' preferred reading:  They do not explain what, if any, difference there is between engaging in collecting debt and engaging in "offering or providing"

_____

[9] The "series-qualifier principle" refers to the "interpretive practice of applying [a] modifier to [a] whole list" rather than "the nearest reasonable referent."  *Lockhart v. United States*, 577 U.S. 347, 364 (2016) (Kagan, J., dissenting).

collecting debt.  In sum, even if the "series-qualifier principle" somehow applied here, it would not support the defendants' reading of the statute.

For those reasons, UDH, JTM, and UHG are "covered persons" under the CFPA. And because the text of the CFPA shows that UHG, UDH, and JTM are covered persons, the Court need not address the legislative history.[10]  *See, e.g.*, *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) (noting that when "[t]he text is clear," a court "need not consider [] extra-textual evidence").

Finally, because UDH, JTM, and UHG are "covered persons," the individual defendants are "related persons."  Under the CFPA, a "related person" includes "any director, officer, or employee charged with managerial responsibility for" a covered person.  12 U.S.C. § 5481(25)(A).  Because the CFPB alleges that Adamo, Manseth, and Turco are officers with managerial responsibility over three "covered persons"— namely, UDH, JTM, or UHG—the individual defendants are "related persons" under the CFPA and therefore are treated as "covered person[s] for all purposes of any provision of Federal consumer financial law."  *See id.* § 5481(25).

---

[10] In any event, the legislative history cannot carry the weight the defendants ask it to carry.  The defendants argue that Congress intended to exempt "debt or securities investors" from the "covered person" definition of the CFPA; they say that Congress made that clear when it rejected a statutory definition that would have defined "covered person" as "any person who engages directly or indirectly in a financial activity, in connection with the provision of a consumer financial product or service."  Docket Item 41 at 11.  But Congress's intent to remove debt or securities investors from the coverage of the CFPA does not resolve whether the defendants—who are alleged to be far more than mere "investors"—are "covered persons."

## 2.     Whether the CFPA-Based Claims Are Plausibly Alleged

Next, the defendants say that they cannot be held liable for any underlying violations of the CFPA.  They maintain that vicarious liability is not a viable theory of liability under the CFPA.  And they say that even if vicarious liability is available under the CFPA, the CFPB has not adequately alleged any underlying violations or demonstrated how any defendant could be liable for the debt collectors' conduct.  For the reasons that follow, this Court disagrees.

### a.     *Company and Individual Liability (Count One)*

#### 1.  Vicarious Liability

The text of the CFPA does not itself resolve whether vicarious liability is available under the statute.  But the Supreme Court has "assumed that, when Congress creates a tort action" or a "species of tort liability," it "legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules."[11]  *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  And "traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."  *Id.*

---

[11] The defendants do not devote much attention to whether Congress created a "species of tort liability" in the CFPA.  In *Curtis v. Loether*, 415 U.S. 189 (1974), the Supreme Court concluded that a damages claim for housing discrimination "sound[ed] basically in tort" because "the statute merely define[d] a new legal duty, and authorize[d] the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach."  *Id.* at 195.  Because that essentially is what the CFPA does, the Court considers whether ordinary tort-related vicarious liability rules apply.  *Cf. Barbato v. Greystone All., LLC*, 916 F.3d 260, 269 (3d Cir. 2019) (noting that "we have relied on traditional agency principles in holding parties vicariously liable under the FDCPA" because "Congress . . . legislates against a legal background of ordinary tort-related vicarious liability rules").

The defendants argue that Congress did not intend to legislate against that backdrop of vicarious liability and instead displaced common law vicarious liability through the particular secondary liability provisions of the CFPA. *See* Docket Item 30-1 at 32-33; Docket Item 31-1 at 32-33. That is, the defendants maintain that because the CFPA already covers "related persons" and those who substantially assist violations of the CFPA by others, those provisions provide the exclusive means of holding "persons" subject to the CFPA liable for the acts of others.

But the CFPA's "related person" provision does not answer the question of whether vicarious liability is available under the CFPA. That provision simply extends the scope of "covered persons" to include certain individuals based on their affiliation with another "covered person." *See* 12 U.S.C. § 5481(25). Because a "related person" is a "covered person" under the CFPA, the CFPB can sue a "related person" for, among other things, any "unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). In other words, a "related person" is liable for his or her own conduct under the CFPA, even if a "related person" is defined by his or her relationship to a "covered person." So the fact that the CFPA extends liability to "related persons" has nothing to do with whether ordinary vicarious liability also applies.

Nor does the inclusion of "substantial assistance" liability necessarily preclude the application of vicarious liability rules. The defendants argue that substantial assistance and vicarious liability are mutually exclusive theories of liability and that "[n]o court has ever held that a plaintiff can plead both a statutory substantial assistance

claim and a common law vicarious liability claim for the same violation under the same law."  Docket Item 52 at 1.  But a recent Seventh Circuit decision suggests that while a plaintiff may not be able to recover under both a substantial assistance and a vicarious liability theory, the inclusion of a substantial assistance provision in a statute does not necessarily mean that vicarious liability is unavailable.

In *United States v. DISH Network L.L.C.*, 954 F.3d 970 (7th Cir. 2020), DISH Network appealed a post-trial judgment holding it liable for violating the Telemarketing Sales Rule, 16 C.F.R. § 310, through the acts of third-party retailers with whom DISH contracted to sell satellite television.  *See id.* at 973-74.  The Telemarketing Sales Rule prohibits, among other things, "[i]nitiating any outbound telephone call to a person when[ t]hat person's telephone number is on the 'do-not-call' registry."  16 C.F.R. § 310.4(b)(1)(iii)(B).  And a separate provision of the Telemarketing Sales Rule provides that "[i]t is a deceptive telemarketing act or practice and a violation of th[e] Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates . . . [section] 310.4 of th[e] Rule."  *Id.* § 310.3(b); *see also* Docket Item 52 at 5 n.6 (the defendants' citing the Telemarketing Sales Rule as one of the "[f]ew federal statutes" or regulations "[that] set forth a 'substantial assistance' standard for imposing secondary liability").

The district court found that DISH violated that rule both through the actions of its third-party retailers and for substantially assisting the third-party retailers' actions.  *See DISH Network*, 954 F.3d at 974.  On appeal, the Seventh Circuit largely affirmed that decision, although it narrowed the scope of liability.  More specifically, the Seventh

Circuit reasoned DISH could not be held liable under both a vicarious and a substantial assistance theory of liability because vicarious liability "require[s] treating the [principal] and its [agents] as one entity" and "it makes little sense to treat [an] entity as assisting itself." *Id.* at 978. Although the Seventh Circuit therefore ordered the district court to vacate its finding that DISH substantially assisted violations of the Telemarketing Sales Rule, *see id.* at 980, it did not otherwise address any possible tension between substantial assistance and vicarious liability. In fact, the Seventh Circuit apparently did not perceive any tension between the Telemarketing Sales Rule's substantial assistance provision and the district court's invocation of general principles of vicarious liability.

Although *DISH Network* suggests that vicarious liability and substantial assistance therefore might be mutually exclusive theories of recovery, it also suggests that the inclusion of a "substantial assistance" provision in a statute or regulation does not necessarily foreclose the possibility that a defendant could be held vicariously liable under that statute or regulation for the acts of its agents. In fact, *DISH Network* suggests the opposite. While the CFPB therefore may be unable to ultimately prevail under both a substantial assistance and a vicarious liability theory, it can proceed under both theories at this stage. *See* Fed. R. Civ. P. 8(a).

2. Underlying Violations

The defendants next argue that the CFPB has not plausibly alleged that any debt collectors who collected debts placed by the defendants engaged in unlawful conduct. They fault the CFPB for not alleging more about the debt collectors, the affected consumers, and the calls themselves, and they say that this additional "context" is necessary under Rule 8; in fact, they say, that additional context would show that the

24

debt collectors did not deceive anybody.  *See* Docket Item 30-1 at 23-29; Docket Item 31-1 at 37-41.  But those arguments are not amenable to resolution on a Rule 12(b)(6) motion to dismiss.

It is unlawful under the CFPA to collect a debt through a deceptive act or practice.  *See* 12 U.S.C. § 5536(a)(1)(B).  A deceptive act or practice includes "(1) a representation, omission, or practice, [] (2) [that] is likely to mislead consumers acting reasonably under the circumstances, and (3)[ that] is material."[12]  *FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019) (alterations omitted).  Here, the amended complaint alleges that the debt collectors who contacted consumers violated the CFPA by "engag[ing] in . . . deceptive[] . . . act[s] or practices," 12 U.S.C. § 5536(a)(1)(B)— practices that included misrepresenting the threat of litigation and the positive effect that repayment would have on a consumer's credit score.  Docket Item 16 at ¶¶ 169-75.

The defendants first argue that the CFPB has not provided adequate notice under Rule 8 because it has not identified the particular debt collectors who made the offending calls, the particular consumers who received those calls, or the broader context of those calls.[13]  *See* Docket Item 30-1 at 23-24; Docket Item 31-1 at 38.  But

---

[12] Because "[t]he term 'deceptive act or practice' has an established meaning in the context of the Federal Trade Commission Act [("FTCA")], and Congress used very similar phrasing in [12 U.S.C.] § 5536(a)(1)(B)," courts have looked to the FTCA in interpreting the CFPA.  *See Gordon*, 819 F.3d at 1193 n.7; *see also CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 772-73 (S.D.N.Y. 2018).   This Court therefore looks to the FTCA when evaluating the elements of the CFPB's claims under the CFPA.

[13] The defendants also contend that the amended complaint does not satisfy Rule 8 because the CFPB raises some allegations against the defendants collectively.  *See* Docket Item 30-1 at 21-23; Docket Item 31-1 at 36-37.  "Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts [those] defendants that identical claims are asserted against each [of them]."  *RD Legal Funding*, 332 F. Supp. 3d at 771; *see also CFPB v. 1st All. Lending, LLC*, 2022 WL 993582, at *7 (D. Conn. Mar. 31, 2022) (same).  And here, the CFPB alleges that a trio

unlike Rule 9(b), which requires a plaintiff to "detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent," *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125 (2d Cir. 2018), Rule 8 requires only a "short and plain statement of the claim," *Iqbal*, 556 U.S. at 677-78.[14]   And here, the CFPB has detailed the allegedly unlawful conduct by the debt collectors, the defendants' relationship to those offending debt collectors, and how the defendants were notified about that allegedly unlawful conduct.  *See* Docket Item 16 at ¶¶ 127-68.  That is enough to satisfy Rule 8.  *Cf. RD Legal Funding*, 332 F. Supp. 3d at 771 ("At this stage of the proceedings, the government is not required to plead specific details as to which entity did what during the alleged course of misconduct." (capitalization removed)).

The defendants also maintain that the CFPB has not plausibly alleged that threats of litigation were deceptive because debtors sometimes were sued on their unpaid debts.  *See* Docket Item 30-1 at 25 & n.7 (listing cases filed by UHG in Texas state court); Docket Item 31-1 at 40.  And the defendants say that the debt collectors did not misrepresent the positive effect that repaying the debts might have on credit scores because "it is quite accurate to suggest that a payment or settlement in full could

---

of related companies, and their corporate officers, engaged in similar conduct that allegedly violated the CFPA and the FDCPA.  So even though the amended complaint sometimes refers to those companies collectively, that alone does not warrant dismissal.  *See, e.g.*, *RD Legal Funding*, 332 F. Supp. 3d at 771 ("The complaint also states adequately which defendants are accused of violating which statutes because the complaint avers that all three of the corporate defendants engaged in each of the alleged violations." (capitalization removed)).

[14] As discussed below, this Court applies Rule 8, not Rule 9(b), to claims under the CFPA.  *See infra* at 33-35.

improve a [consumer's] credit history." *See* Docket Item 30-1 at 26; Docket Item 31-1 at 40.

In other words, the defendants essentially ask this Court to assume that other facts—facts not pleaded in the amended complaint and therefore not before the Court— would undercut the CFPB's claims.  But on a motion to dismiss, a court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff," *see Trs. of Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 566, not assume the truth of facts outside the complaint that might support the defendants' view of the case.

And the CFPB has sufficiently alleged that the debt collectors' representations were misleading.  "Misrepresentations regarding the legal or practical consequences of failing to pay back [a consumer's] debt[] . . . are [] material, as they are likely to affect the consumer's conduct regarding the alleged debt."  *CFPB v. NDG Fin. Corp.*, 2016 WL 7188792, at *14 (S.D.N.Y. Dec. 2, 2016); *see also RD Legal Funding*, 332 F. Supp. 3d at 773 ("Express representations that are shown to be false are presumed material.").  Here, the CFPB specifically alleges that debt collectors threatened consumers with litigation even though (1) UDH, JTM, and UHG had no immediate plans to sue the consumers on those debts; (2) the debt collectors were not authorized to sue on those debts; and (3) the debt collectors did not in fact sue the consumers on those debts.  *See* Docket Item 16 at ¶¶ 144-46.  And the CFPB says that debt collectors falsely represented the possible effect that repayment would have on a consumer's credit score because neither the debt collectors nor any of the defendants here reported information about the consumers' debt to credit reporting agencies.  *See id.* at ¶¶ 147-

49.  Accepting those allegations as true, the CFPB has alleged that the debt collectors made material representations that were likely to mislead consumers.  *See Moses*, 913 F.3d at 306.

### 3.  <u>Vicarious Liability for the Underlying Violations</u>

Because the Court concludes that vicarious liability is a viable theory under the CFPA and that the CFPB has plausibly alleged underlying violations of the CFPA, it now addresses whether the defendants can be held liable for those underlying violations. The CFPB says that UDH, JTM, and UHG are liable for the debt collectors' violations under either of two theories: actual authority or apparent authority.  *See* Docket Item 37 at 46-50.  But because the CFPB has plausibly alleged that UDH, JTM, and UHG can be held liable for acts taken by the debt collectors with actual authority, the Court need not address whether the debt collectors also acted with apparent authority.

"Actual authority is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, [the agent] is privileged to do because of the principal's manifestations to [it]."  *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (citation and internal quotation marks omitted).  "Such authority may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act."  *Id.*  Here, the CFPB has alleged more than enough to plead actual authority.

The amended complaint alleges that UDH, JTM, and UHG "contracted with debt collectors to collect debt on behalf of UDH, JTM, and UHG, either directly or through another debt collector."  Docket Item 16 at ¶ 127.  It says that "UDH, JTM, and UHG provided the debt collectors collecting on their behalf with consumers' contact,"

28

personal, and account information and that UDH, JTM, and UHG "authorized the debt collectors to contact the consumers directly." *Id.* at ¶¶ 128-29. It says that UDH, JTM, and UHG "provided written guidance to the debt collectors" spelling out "certain conduct standards" and requirements for "audits, testing, and training of staff" and that UDH, JTM, and UHG instructed the debt collectors about "how to handle consumer complaints, whether to discipline collection employees, and how to change collection behavior." *Id.* at ¶¶ 135-36. And it says that UDH, JTM, and UHG "had the authority to remove accounts from debt collectors and to refuse to send additional accounts to debt collectors." *Id.* at ¶ 137.

The amended complaint also alleges that given that authority and those instructions, the debt collectors would then contact consumers to collect the defaulted debts. *Id.* at ¶¶ 129-30. And it alleges that the debt collectors used a variety of unlawful means to collect—for example, falsely threatening litigation and misrepresenting the effect that payment or nonpayment of the debt would have on the consumers' credit scores. *See id.* at ¶¶ 138-49. Although UDH, JTM, and UHG received "hundreds of complaints from consumers" about the offending practices, the amended complaint says, UDH, JTM, and UHG "continued placing debt with and, in some instances, selling debt to" the offending debt collectors. *Id.* at ¶¶ 153, 158; *see also id.* at ¶ 162 ("[The] defendants continued to allow the debt collectors . . . to collect from thousands of consumers . . . for years after receiving evidence of the violations.").

"[C]onsent for actual authority may be either express or implied," and actual authority can exist "when verbal or other acts by a principal reasonably give the appearance of authority to the agent." *Precedo Cap. Grp., Inc. v. Twitter, Inc.*, 33 F.

Supp. 3d 245, 253 (S.D.N.Y. 2014).  Here, the CFPB says that the debt collectors collected on behalf of UDH, JTM, and UHG under the express instructions of those companies.  And the CFPB says that the debt collectors employed a variety of unlawful means to collect on debts; that UDH, JTM, and UHG knew about that conduct; and that UDH, JTM, and UHG not only "continued doing business as usual" with the offending debt collectors but in fact took steps to conceal their relationship with the collectors. *See, e.g.*, Docket Item 16 at ¶¶ 138-49, 153-68.  At this stage, that is sufficient to allege that UDH, JTM, and UHG are vicariously liable for the acts of debt collectors who had actual authority to act on their behalf.  *See, e.g.*, *DISH Network*, 954 F.3d at 977 (upholding finding of vicarious liability where the defendants' "agents[] . . . acted within their authority to sell TV service using phone calls, [] those acts benefitted DISH," and "DISH knew what the [agents] were doing" when the agents violated applicable law).

### 4.  Individual Liability

The CFPB also alleges that the individual defendants—Adamo, Manseth, and Turco—are liable for placing debts for collection with companies that falsely threatened litigation or that misrepresented the possible effects of repayment on a consumer's credit score.  Docket Item 16 at ¶¶ 169-75.  Under the CFPA, "individuals may be liable for unfair or deceptive acts and practices when they 'participated directly in the practices or acts or had authority to control them' and 'had or should have had knowledge or awareness' of the misconduct."[15]  *1st All. Lending*, 2022 WL 993582, at *6 (quoting *Moses*, 913 F.3d at 307); *see also Gordon*, 819 F.3d at 1193 (same).

---

[15] Adamo, Manseth, and Turco contend that the CFPB must allege actual knowledge of a violation to establish individual liability under the CFPA.  *See* Docket Item 30-1 at 40-42 (citing *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 (S.D.N.Y. 2014)).  But the Second Circuit has held that "[t]he FTC need not establish . . . that [a]

The CFPB has sufficiently alleged that that the individual defendants had knowledge of the deceptive conduct.  *See 1st All. Lending*, 2022 WL 993582, at *6. First, the CFPB says that the individual defendants, who held high-level leadership positions in UDH, JTM, and UHG, directed those companies to contract with the debt collectors to collect on UDH's, JTM's, and UHG's behalf.  Docket Item 16 at ¶¶ 56-61, 63-68, 73-82, 87-93, 127.  The individual defendants also monitored the debt collectors' activities and legal compliance, and they handled consumer complaints.  *Id.* at ¶¶ 60, 81, 91-92, 153-57.  And while the individual defendants maintain that the CFPB cannot credibly allege knowledge based on "a few hundred complaints," *see* Docket Item 30-1 at 41, the Court must draw every inference in the CFPB's favor at this stage, *see Trs. of Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 566.  In light of the CFPB's allegations that the individual defendants had upper-level management positions in UDH, JTM, and UHG and handled consumer complaints at those companies, it certainly is plausible that Adamo, Manseth, and Turco had the requisite knowledge of the debt collectors' allegedly unlawful conduct.  *See 1st All. Lending*, 2022 WL 993582, at *6.

The CFPB also has sufficiently alleged that the individual defendants had the authority to control the unlawful practices.  *See id.*  The amended complaint says that

---

defendant had actual and explicit knowledge of the particular deception at issue" to allege individual liability under the parallel provisions of the FTCA.  *See Moses*, 913 F.3d at 307.  Instead, "knowledge may be established by showing that the individual defendant had actual knowledge of the deceptive conduct, *or was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth*."  *Id.* (emphasis added) (alterations, citation, and internal quotation marks omitted).  Because courts look to the FTCA when interpreting the CFPA, *see supra* at 25 n.12, this Court applies the FTCA's standard for individual liability in considering whether the CFPB has adequately alleged that Adamo, Manseth, and Turco violated the CFPA.

Adamo, Manseth, and Turco "had the authority to instruct debt collectors about how to handle consumer complaints, whether to discipline collection employees, and how to change collection behavior." Docket Item 16 at ¶ 136. More generally, it says that Adamo, Manseth, and Turco "had the authority to remove accounts from debt collectors and to refuse to send additional accounts to debt collectors." *Id.* In other words, the amended complaint alleges that the individual defendants had the authority to correct the unlawful debt collection practices used by the debt collectors and to pull accounts from offending debt collectors but that they failed to do so. Accepting those allegations as true, as the Court must at this stage, the CFPB has sufficiently alleged that the individual defendants enabled or at least permitted what they knew was the unlawful conduct of the debt collectors despite having the authority to control it.

> b.   *Substantial Assistance (Counts Two and Three)*

The amended complaint also alleges that the defendants substantially assisted violations of the CFPA by placing debts with, or selling debts to, debt collectors who falsely threatened litigation or misrepresented the possible effects of repayment on a consumer's credit score. *See id.* at ¶¶ 176-84. And the amended complaint alleges that UDH and Manseth substantially assisted violations of the CFPA by placing debt with, and selling debt to, debt collectors who made false threats of arrest. *Id.* at ¶¶ 185-89.

The defendants maintain that Rule 9(b) applies to the substantial assistance claims and that the substantial assistance claims therefore are inadequately pleaded. *See* Docket Item 30-1 at 35-38; Docket Item 31-1 at 33-36. For the reasons that follow, the Court concludes that Rule 8, not Rule 9, applies to the CFPB's substantial assistance claims and that those claims clear the Rule 8 bar.

1.   Rule 8 or Rule 9

Rule 9(b) requires a party "alleging fraud or mistake[]" to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "That ordinarily requires a complaint alleging fraud to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (citation and internal quotation marks omitted).

In *Consumer Financial Protection Bureau v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729 (S.D.N.Y. 2018), *vacated on other grounds*, 828 F. App'x 68 (2d Cir. 2020) (summary order), the Southern District of New York considered whether Rule 9(b) applies to claims of unfair, deceptive, or abusive practices under the CFPA—and, in turn, substantial assistance claims under the CFPA.[16]  *Id.* at 768-70.  The court concluded that Rule 9(b) does not apply to deception claims for three reasons: (1) "consumer protection claims are not claims of fraud, even if there is a deceptive dimension to them"; (2) "the United States Supreme Court has consistently cautioned against extending [Rule 9(b)] beyond claims for fraud or mistake"; and (3) "application of Rule 9(b) 'to consumer protection claims is not only inconsistent with some of the policy reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes.'"  *Id.* (quoting *CFPB v. Navient Corp.*,

---

[16] The Southern District's decision was vacated by the Second Circuit after the Supreme Court's decision in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), which resolved a challenge to the constitutionality of the CFPB's structure that is not at issue here.  *See CFPB v. RD Legal Funding*, 828 F. App'x 68 (2d Cir. 2020) (summary order).

2017 WL 3380530, at *24 (M.D. Pa. Aug. 4, 2017)).  And the court then reasoned that

Rule 9(b) also does not apply to substantial assistance claims under 12 U.S.C. §

5536(a)(3) because (1) "the primary violation" of the CFPA does not trigger Rule 9(b) for

the reasons just stated and (2) "the scienter requirements of [a substantial assistance

claim] do not implicate automatically Rule 9(b)'s heightened pleading requirements."  *Id.*

at 769-70.  Other "[c]ourts within this Circuit" likewise "have declined to apply Rule

9(b)'s requirements in the context of consumer protection claims."  *1st All. Lending*,

2022 WL 993582, at *5 (collecting cases); *see also id.* at *6 (noting "the overwhelming

weight of precedent militates against applying Rule 9(b) to CFPA claims" (citation and

internal quotation marks omitted)).

The defendants cite two cases that concluded otherwise.  *See* Docket Item 30-1

at 35-36.  In *Consumer Financial Protection Bureau v. Commonwealth Equity Group*,

554 F. Supp. 3d 202 (D. Mass. 2021), the court reasoned that "[c]laims that rely on

allegations of intentional and malicious false statements" were "effective[ly] allegations

of fraudulent misrepresentations" and therefore "trigger[ed] Rule 9(b)."  *Id.* at 209.  For

that reason, the court concluded that the CFPB's "alleg[ations] that [the] defendants

made false statements on their website" had to satisfy Rule 9(b).  *Id.* at 209-10.  And in

*Consumer Financial Protection Bureau v. Prime Marketing Holdings, LLC*, 2016 WL

10516097 (C.D. Cal. Nov. 15, 2016), the court applied Rule 9(b) because the CFPB

"alleg[ed] that [the d]efendant participated in a unified course of fraudulent conduct."  *Id.*

at *5-6.

This Court finds the weight of the authority and the reasoning of the *RD Legal*

*Funding* court more persuasive.  As noted above, the CFPA's underlying deception

claims require "(1) a representation, omission, or practice, [] (2) [that] is likely to mislead

consumers acting reasonably under the circumstances, and (3)[ that] is material."

*Moses*, 913 F.3d at 306 (alterations omitted).  That "d[oes] not require proof of the same

essential elements (such as reliance) as common-law fraud."  *1st All. Lending*, 2022 WL

993582, at *5 (quoting *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511

(2d Cir. 2005)).  And this Court likewise agrees that the "knowledge or recklessness"

standard required for substantial assistance liability under 12 U.S.C. § 5536(a)(3) does

not transform a substantial assistance claim into the sort of fraud-based claim that

would trigger Rule 9(b).  *See RD Legal Funding*, 332 F. Supp. 3d at 770 (concluding

that "the scienter requirements of 'knowingly or recklessly' do not implicate

automatically Rule 9(b)'s heightened pleading requirements" because that "standard is

distinguishable from the scienter associated with fraud, which encompasses a particular

state of mind, an element of intent or deception" (citation and internal quotation marks

omitted)).  For those and the other reasons stated above, this Court applies the Rule 8

standard, rather than the Rule 9(b) standard, to the CFPB's substantial assistance

claims.

> 2.  Substantial Assistance of the Underlying Violations

With that preliminary issue addressed, the Court turns to the substance of the

CFPB's substantial assistance claims.  The CFPA prohibits "any person" from

"knowingly or recklessly provid[ing] substantial assistance to a covered person . . . in

violation of the provisions of section 5531 of this title, or any rule or order issued

thereunder."  12 U.S.C. § 5536(a)(3).  Although relatively few cases have precisely

delineated the elements of substantial assistance under the CFPA, courts have required

(1) a primary violation of the CFPA; (2) the defendant's knowledge or reckless disregard of the primary violation; and (3) the defendant's substantial assistance in the primary violation. *See, e.g.*, *RD Legal Funding*, 332 F. Supp. 3d at 771-72; *CFPB v. Univ. Debt & Payment Sols., LLC*, 2019 WL 1295004, at *15 (N.D. Ga. Mar. 21, 2019); *cf. FTC v. WV Univ. Mgmt., LLC*, 877 F.3d 1234, 1241 (11th Cir. 2017) (reasoning that "substantial assistance" under the Telemarketing Sales Rule requires a showing of "a primary violation, substantial assistance, and a culpable state of mind"). "Recklessness sufficient to establish scienter involves conduct that is highly unreasonable and represents an extreme departure from the standards of ordinary care." *RD Legal Funding*, 332 F. Supp. 3d at 772.

As explained above, the amended complaint adequately pleads that the debt collectors' representations about future litigation and the possible effects of repayment on a consumer's credit score were deceptive practices that violated the CFPA. *See supra* at 24-28. Moreover, the amended complaint also sufficiently alleges that other debt collectors violated the CFPA "by falsely threatening consumers with criminal charges, arrest, or jail time." Docket Item 16 at ¶ 186. The amended complaint explains that the debt collectors' representations about imminent criminal charges, arrests, or jail time "were false because [the consumers' debts] were not debts for which nonpayment would result in any of th[ose] consequences." *Id.* at ¶ 152. For much the same reason that falsely threatening consumers with litigation is a material representation that could mislead consumers acting reasonably under the circumstances, so too is falsely threatening consumers with arrest, prosecution, or jail time for nonpayment. *See RD Legal Funding*, 332 F. Supp. 3d at 772-73.

Likewise, the CFPB has sufficiently alleged that the defendants either knew about or recklessly disregarded the underlying violations. *See id.* at 772. The amended complaint alleges that the defendants "received hundreds of complaints from consumers that debt collectors collecting on debt placed by [the] defendants or sold by [the] defendants" made false representations about the possibility of arrest, jail, litigation, or changes to a consumer's credit score. Docket Item 16 at ¶ 153. It also says that the defendants "received recorded collection calls with consumers from placement debt collectors in which the debt collectors were falsely threatening lawsuits and making false statements about credit reporting." *Id.* at ¶ 156. It alleges that the defendants placed debt with, or sold debt to, debt collectors that had been "sued by state and federal regulators" for engaging in some of the same conduct alleged in the amended complaint. *Id.* at ¶ 163. And it alleges that Adamo, Manseth, and Turco hold or held high-level leadership positions at UDH, JTM, and UHG; directed those companies to contract with the debt collectors; monitored the debt collectors' activities and legal compliance; and dealt with consumer complaints. *Id.* at ¶¶ 56-61, 63-68, 73-82, 87-93, 127, 153-57, 183, 188.

Essentially, the amended complaint alleges that the defendants ignored multiple red flags about the legal violations committed by the debt collectors with whom they placed debts and that the defendants continued to reap the benefits of those illegal activities. *See id.* at ¶¶ 161-62. In fact, the amended complaint says that after the defendants were alerted to those red flags, they took steps to conceal the underlying violations—for example, by "telling their debt collectors to supply only legally[ ]compliant calls for audits"; refusing "to give original creditors call notes or phone call recordings";

and falsely claiming that they had "terminated relationships with debt collectors that have been [the] subject of multiple complaints."  *See id.* at ¶¶ 164-66.  That is sufficient at the pleading stage to allege "conduct that is highly unreasonable and . . . an extreme departure from the standards of ordinary care."  *RD Legal Funding*, 332 F. Supp. 3d at 772; *see also id.* at 774 (concluding that the CFPB alleged knowledge or recklessness based on the defendant's "role as founder and owner of the [defendant] entities and his authority to dictate the terms of [c]onsumer contracts" (internal quotation marks omitted)).  And while the defendants contend that the CFPB has not demonstrated that they acted knowingly or recklessly because of "key facts omitted from the [amended complaint]," *see* Docket Item 30-1 at 37; *see also* Docket Item 31-1 at 35, those "issues of fact, credibility, and [] weight of the evidence are not properly considered on a motion to dismiss," *see Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015).

Finally, the CFPB has adequately alleged that the defendants substantially assisted the underlying violations.  "To plead [] the 'substantial assistance' element, the [g]overnment must establish that the [defendant] in some sort associated [itself] with the venture, that [it] participated in it as something [it] wished to bring about, and that [it] sought by [its] action to make it succeed."  *See RD Legal Funding*, 332 F. Supp. 3d at 772; *see also Univ. Debt & Payment Sols.*, 2019 WL 1295004, at *6 (same).  Here, the amended complaint alleges that after the defendants received notice that they had placed debts with or sold debts to debt collectors who violated the CFPA, they continued to do business with those debt collectors.  Docket Item 16 at ¶¶ 157-58, 160-62.  In fact, it says that the defendants took steps to ensure that those offending debt collectors avoided repercussions.  *See id.* at ¶¶ 164-67.  And it says that all the while,

the defendants "continued to benefit financially by seeking and accepting payments from the[] debt collectors for years after receiving evidence of the violations."  *Id.* at ¶ 162.

In other words, the amended complaint alleges that the defendants placed debts for collection with or sold debts to the offending debt collectors; helped those debt collectors succeed in violating the CFPA; and profited from their business relationships with the debt collectors.  That is sufficient to allege that the defendants substantially assisted the underlying violations of the CFPA.  *See, e.g.*, *RD Legal Funding*, 332 F. Supp. 3d at 774 (concluding that defendant "provided 'substantial assistance'" to underlying violations by, among other things, "continuing to craft the [companies'] policies and procedures and exercising authority over those [companies]").

### 3.    Statute of Limitations

The defendants also argue that the statute of limitations has expired on some of the CFPB's claims under the CFPA.  More specifically, UDH and JTM argue that the CFPA claims against them are time barred, and the individual defendants argue that they cannot be held liable for anything in connection with UDH or JTM.  Docket Item 30-1 at 42; Docket Item 31-1 at 43-44.

The CFPA provides that "[e]xcept as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates."  12 U.S.C. § 5564(g)(1).  The parties dispute whether that "date of discovery" is when the CFPB *actually* discovered the violations or when the CFPB (or a reasonably diligent plaintiff) *should have* discovered the violations. *Compare* Docket Item 30-1 at 42 and Docket Item 31-1 at 43-44, *with* Docket Item 37 at

56.  But either way, the defendants have not shown that any of the CFPA claims are time barred as pleaded.

"[A] statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Conn. Gen. Life Ins. Co. v. BioHealth Laboratories, Inc.*, 988 F.3d 127, 131-32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)).  The defendants point to the "consumer complaints" mentioned in the amended complaint to argue that the CFPB had actual or constructive notice of the alleged violations when it received those complaints.  Docket Item 31-1 at 44.  But the amended complaint does not say when the CFPB received those consumer complaints or suggest when the CFPB might have had reason to be aware of them.  *See, e.g.*, Docket Item 16 at ¶¶ 143, 151.  So the statute of limitations defense does not "appear[] on the face of the complaint."  *See Conn. Gen. Life Ins. Co*, 988 F.3d at 131-32.

What is more, the only case cited by the defendants to suggest that the statute of limitations begins when the CFPB receives a consumer complaint concluded that "[t]he notion that mere receipt of a consumer complaint can trigger the statute of limitations [] against [the] CFPB is unsupported by any authority and would be unworkable."  *CFPB v. Nationwide Biweekly Admin., Inc.*, 2017 WL 3948396, at *10 (N.D. Cal. Sept. 8, 2017), *vacated on other grounds*, 2023 WL 566112 (9th Cir. Jan. 27, 2023).  Instead, the court reasoned that "a credible and specific consumer complaint might *in some circumstances* serve as a storm warning and put the CFPB on inquiry notice that it should begin investigating."  *Id.* (emphasis added) (citation and internal quotation marks omitted).  But because "[n]othing in the record suggest[ed] that [the] CFPB actually

discovered" or should have discovered "the facts constituting the violation" in that case, the court concluded that the statute of limitations did not bar the CFPB's claims. *See id.*

So too here. Because this Court cannot conclude from the face of the amended complaint that the CFPB's claims are time barred, the defendants have not shown that the statute of limitations has elapsed on those claims. *See Conn. Gen. Life Ins. Co.*, 988 F.3d at 131-32.

### B. FDCPA-Based Claims (Counts Four and Five)

The amended complaint also alleges that JTM and UHG violated the FDCPA by "represent[ing] expressly or impliedly, through placement debt collectors or their downstream debt collectors, that consumers would be sued if they did not settle their debts now or that consumers' credit scores would be affected by the payment (or nonpayment) of the debt." *See* Docket Item 16 at ¶¶ 190-98. And because a violation of the FDCPA also is a violation of the CFPA, *see* 12 U.S.C. § 5536(a)(1)(A), the amended complaint alleges that JTM and UHG are liable under the CFPA for those violations as well. *See* Docket Item 16 at ¶¶ 199-201.

JTM and UHG have moved to dismiss those claims, arguing that they are time barred, that vicarious liability is not available under the FDCPA, and that, in any event, the CFPB has not pleaded facts to show how JTM and UHG could be held vicariously liable for any alleged FDCPA violations. Docket Item 30-1 at 29-32; Docket Item 31-1 at 27-32, 42-43. For the reasons that follow, this Court concludes that the CFPB has adequately alleged its FDCPA-based claims.

### 1.    Whether the FDCPA-Based Claims Are Time Barred

JTM first argues that the FDCPA claim, and the CFPA claim based on the FDCPA violation, are time barred.[17]  Docket Item 31-1 at 42-43.  JTM cites the one-year statute of limitations under 15 U.S.C. § 1692k(d) and argues that "[d]irect and derivative claims under the FDCPA are both subject to a one-year statute of limitations."  *Id.* at 42.  The CFPB, on the other hand, maintains that section 1692k(d) applies only to private civil actions under the FDCPA and that the CFPA's general three-year statute of limitations instead applies.  *See* Docket Item 37 at 53-55.  This Court agrees with the CFPB.

Section 1692k of the FDCPA, entitled "Civil liability," provides that "any debt collector who fails to comply with any provision of [the FDCPA] with respect to any person is liable to such person" for actual and statutory damages.  15 U.S.C. § 1692k(a).  That section of the FDCPA also provides a statute of limitations for such violations:  "An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs."  *Id.* § 1692k(d).  The "Administrative enforcement" section of the FDCPA, on the other hand, provides that the CFPB may enforce "compliance with any requirements imposed under this subchapter."  *Id.* § 1692l(b)(6).  That section does not include an explicit statute of limitations.

---

[17] UHG does not argue that the CFPB's FDCPA-based claims against it are time barred.  *See* Docket Item 30-1.  In any event, those claims are not time barred for the reasons stated in this decision.

Few courts have addressed whether FDCPA claims brought by the CFPB are governed by the one-year statute of limitations under section 1692k or some other limitations period.  *See, e.g.*, *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1379 (N.D. Ga. 2015) (noting that "a survey of case law across the country has revealed little that is helpful to resolving the [FDCPA] statute of limitations question here").  But the few courts that have examined that question have favored the CFPB's interpretation.  For example, in *Consumer Financial Protection Bureau v. Ocwen Financial Corp.*, 2019 WL 13203853 (S.D. Fla. Sept. 5, 2019), the court reasoned that the CFPA's three-year statute of limitations applied to the CFPB's FDCPA-based claims because, among other reasons, section 1692k "makes no reference to any governmental plaintiff and arguably applies only to private causes of action."  *Id.* at *25-26.  In *Consumer Financial Protection Bureau v. Weltman, Weinberg & Reis Co.*, 2017 WL 4348916 (N.D. Ohio Sept. 29, 2017), the court declined to decide the question either way but found the government's argument for a three-year limitations period "persuasive" because the government is "not a 'consumer' for purposes of the FDCPA and[] . . . the one-year statute of limitations applicable to FDCPA claims brought by consumers [is] inapplicable."  *Id.* at *7-8.  And in *Bureau of Consumer Financial Protection vs. Citizens Bank, N.A.*, 504 F. Supp. 3d 39 (D.R.I. 2017), the court applied a three-year limitations period to the CFPB's enforcement action under a similar statutory scheme, the Truth in Lending Act ("TILA").  *See id.* at 46-49 (finding section 1692l of the FDCPA to be "nearly identical" to the language of the TILA and applying the three-year limitations period of the CFPA).

43

This Court finds the reasoning of those opinions persuasive here, particularly because the text of the FDCPA does not clearly favor the defendants' interpretation. Section 1692k provides that a "debt collector who fails to comply with any provision of [the FDCPA] with respect to any person is liable *to such person,*" 15 U.S.C. § 1692k(a) (emphasis added), and sets a one-year statute of limitations for those actions, 15 U.S.C. § 1692k(d).   The word "person" is not defined in the FDCPA's "Definitions" section, *see id.* § 1692a, but that section explicitly defines "Bureau" to mean "the Bureau of Consumer Financial Protection."  *Id.* § 1692a(1).  And while 15 U.S.C. § 1692k does not specifically mention the "Bureau," 15 U.S.C. § 1692l does.  *See* 15 U.S.C. § 1692l(b)(6).  So for this Court to conclude that the limitations period in section 1692k(d) applies to the CFPB as well as to private parties, it would have to infer that section 1692k should be read to include the word "Bureau" even though that word does not appear in that section but does in the very next one.

At the very least, 15 U.S.C. § 1692k(d) therefore is ambiguous about whether the one-year limitations period applies to federal agencies bringing enforcement actions under 15 U.S.C. § 1692l.  And "when the [government] elects to subject itself to a statute of limitations, the [government] is given the benefit of the doubt if the scope of the statute is ambiguous."  *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 96 (2006). Because it is at best unclear whether 15 U.S.C. § 1692k(d) applies to federal agencies, the CFPB's FDCPA claim, and its CFPA claim rooted in the alleged FDCPA violations, are governed by the three-year statute of limitations in 12 U.S.C. § 5564(g)(1).

And for much the same reason that the CFPB's claims under the CFPA are not time barred, *see supra* at 39-41, the CFPB's FDCPA and derivative FDCPA claims are

not time barred based on the face of the amended complaint.  Nothing in the amended complaint pleads when the CFPB received consumer complaints, let alone when it discovered—or even should have discovered—the alleged FDCPA violations here. Because JTM's statute of limitations defense to the CFPB's FDCPA-based claims does not "appear[] on the face of the complaint," *see Conn. Gen. Life Ins. Co.*, 988 F.3d at 131-32, its motion to dismiss based on timeliness is denied.

### 2.     Whether the FDCPA Claims Are Adequately Alleged

#### a.    *Vicarious Liability*

UHG and JTM also argue that the FDCPA claims must be dismissed because vicarious liability is not available under the FDCPA.  Docket Item 30-1 at 29-32; Docket Item 31-1 at 27.  But other courts have "relied on traditional agency principles in holding parties vicariously liable under the FDCPA." *Barbato*, 916 F.3d at 269; *see also Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325 (7th Cir. 2016) (concluding that vicarious liability applies under the FDCPA because "[a] debt collector should not be able to avoid liability for unlawful debt collection practices simply by contracting with another company to do what the law does not allow it to do").  In other words, "an entity which itself meets the definition of 'debt collector' may be held vicariously liable for unlawful collection activities carried out by another on its behalf." *Barbato*, 916 F.3d at 269; *see Janetos*, 825 F.3d at 325 ("[I]t is fair and consistent with the [FDCPA] to require a debt collector who is independently obliged to comply with the [FDCPA] to monitor the actions of those it enlists to collect debts on its behalf."); *Mullery v. JTM Cap. Mgmt., Inc.*, 2018 WL 8332821, at *3 (W.D.N.Y. Nov. 30, 2018) ("Although the FDCPA is silent on the issue of vicarious liability, district courts in this circuit[] . . .

45

have determined that entities that meet the FDCPA's definition of 'debt collector' may be held vicariously liable for the wrongful collection activity of another carried on for its behalf." (citation and internal quotation marks omitted)), *adopted*, 2019 WL 2135484 (W.D.N.Y. May 16, 2019).[18]

Despite those decisions, UHG and JTM nevertheless maintain that the CFPB cannot invoke vicarious liability because vicarious liability is limited to plaintiffs who plead "personal injuries" and because vicarious liability poses "risks of multiple recovery and inconsistent judg[]ments." Docket Item 30-1 at 31. But UHG and JTM offer no reason why vicarious liability under the FDCPA is unavailable to the government simply because the government need not be personally injured by any unlawful conduct.[19] And the possibility of multiple recovery or inconsistent judgments might affect potential limitations on liability at a future stage of the case, but it is not relevant to the "ordinary tort-related vicarious liability rules" that generally govern vicarious liability. *See Barbato*, 916 F.3d at 269; *cf. Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 585-87 (S.D.N.Y. 2015) (noting that "principals or corporate parents may be held vicariously

---

[18] Although UHG and JTM attempt to distinguish those cases as involving situations where "the alleged 'principal' had performed a negligent act that led to the harm or the primary violator was the attorney for [the] defendant," Docket Item 41 at 16 n.10; *see also* Docket Item 40 at 14, other decisions generally describe the FDCPA as incorporating "ordinary tort-related vicarious liability rules." *See Barbato*, 916 F.3d at 269; *see also Janetos*, 825 F.3d at 325.

[19] UHG cites the Seventh Circuit's decision in *Janetos* to argue that vicarious liability is available "only to vindicate personal injuries." Docket Item 30-1 at 30-31. But the Seventh Circuit in *Janetos* held that vicarious liability generally is available under the FDCPA; it did not limit that holding to private plaintiffs. *See Janetos*, 825 F.3d at 325. And while UHG asserts that the CFPB does not have standing because vicarious liability is not available under the FDCPA, *see* Docket Item 30-1 at 31, this Court concludes that vicarious liability is available under the FDCPA for the reasons stated above.

liable for their agents' or subsidiaries' actions that violated the FDCPA" before evaluating whether any "concerns about achieving inconsistent judgments" between the principal and agent "are present here").

For all those reasons, the CFPB can pursue its FDCPA-based claims against UHG and JTM based on a theory of vicarious liability.  And for the same reasons addressed above, *see supra* at 28-30, the CFPB has adequately alleged that UHG and JTM had actual authority over the debt collectors who allegedly violated the FDCPA.

> b.   *Principal Purpose*

JTM also asserts that it is not a "debt collector" under the FDCPA.[20]  *See* Docket Item 31-1 at 28-29.  Under the FDCPA, "[t]he term 'debt collector' means any person who uses . . . interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  And the amended complaint plausibly alleges that JTM meets the first definition of "debt collector"—a business with a principal purpose of collecting debts—because it purchased portfolios of defaulted consumer debt and derived the majority of its revenues from debt collection.  *See* Docket Item 16 at ¶¶ 27-28; *see also McAdory v. M.N.S. Assocs., LLC*, 952 F.3d 1089, 1093 (9th Cir. 2020) (finding FDCPA claim sufficiently alleged where the "complaint alleged that [the defendant's] principal

---

[20] UDH also argues that it is not a debt collector within the meaning of the FDCPA.  *See* Docket Item 31-1 at 27-28.  But the CFPB does not bring any FDCPA-based claims against UDH; those claims are alleged only against JTM and UHG.  *See* Docket Item 16 at ¶¶ 190-201.  To the extent that UHG, not UDH, intended to raise that argument, the CFPB has adequately alleged that UHG is a "debt collector" for the same reasons that it has adequately alleged that JTM is a "debt collector"—namely, its principal purpose is collecting debt.  *See id.* at ¶¶ 43-44.

purpose was to buy consumer debts in order to collect on them[] and that this is how [the defendant] generated most or all of its income"); *see also Barbato*, 916 F.3d at 268 ("'Collection' by its very definition may be indirect, and that is the type of collection in which [the defendant] engages: it buys consumer debt and hires debt collectors to collect on it.").

JTM also maintains that its "principal purpose was no longer collection of debts" once it "stopped placing accounts for collection."  Docket Item 31-1 at 28.  But accepting that argument asks this Court to resolve factual disputes in JTM's favor based on JTM's own bare assertions.  And at this stage of the case, the Court cannot speculatively curtail the CFPB's claims based on when JTM says it stopped meeting the FDCPA's definition of a "debt collector."[21]

### c.    Underlying FDCPA Violations

Finally, the CFPB has adequately alleged that the debt collectors referred to in the amended complaint violated the FDCPA.  The FDCPA prohibits debt collectors from "threat[ening] to take any action that cannot legally be taken or that is not intended to be taken" and from "us[ing] any false representation or deceptive means to collect or attempt to collect any debt."  15 U.S.C. § 1692e(5), (10).  Here, the amended complaint alleges that UHG and JTM violated the FDCPA by placing debts for collection with collectors who falsely threatened impending litigation and misrepresented the possible

---

[21] JTM also asserts that some debt collectors to whom it sold debt "may also not be FDCPA debt collectors."  Docket Item 31-1 at 29 (capitalization removed).  But apart from speculating that "[a] purchaser of debt may (and frequently does) hold debt only for resale and therefore is not a 'debt collector' under the FDCPA," *see id.*, JTM offers no reason why the debt collectors to whom the amended complaint refers are not subject to the FDCPA.

effect of repayment on a consumer's credit score.  *See* Docket Item 16 at ¶¶ 190-201.

That is sufficient to allege violations of the FDCPA.  *See* 15 U.S.C. § 1692e(5), (10);

*see also Fainbrun v. Sw. Credit Sys., L.P.*, 246 F.R.D. 128, 132 (E.D.N.Y. 2007) (finding

that the defendant violated 15 U.S.C. § 1692e(5) and (10) by falsely "implying that

additional negative reporting to credit bureaus [would] result if the consumer continue[d]

his or her failure to pay" because the defendant "clearly had no intention or ability to

report late or missed payments or any additional defaults to credit bureaus").  And while

UHG and JTM maintain that additional "context" is necessary to undercut the CFPB's

FDCPA-based claims, *see* Docket Item 30-1 at 24-27; Docket Item 31-1 at 39-41, that

argument is for summary judgment and inapposite on a motion to dismiss.

For all those reasons, the CFPB has adequately alleged that UHG and JTM

violated the FDCPA and, in doing so, also violated the CFPA.

III.    **DUE PROCESS**

The defendants maintain that even if the CFPB has alleged viable claims under

the CFPA and the FDCPA, the second amended complaint still must be dismissed

because the CFPB's purportedly novel enforcement action violates their due process

rights.  *See* Docket Item 30-1 at 38-39; Docket Item 31-1 at 24-25.  Again, this Court

disagrees.

"A fundamental principle in our legal system is that laws which regulate persons

or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox

Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also County of Suffolk v. First

Am. Real Estate Sols.*, 261 F.3d 179, 195 (2d Cir. 2001) ("Due process requires that

before a . . . significant civil or administrative penalty attaches, an individual must have

fair warning of the conduct prohibited by the statute or the regulation that makes such a

sanction possible."). Here, "the relevant question . . . is whether [the defendants] had

fair notice that [their] conduct could fall within the meaning of the statute" and therefore

could be the target of the CFPB's enforcement action. *See FTC v. Wyndham*

*Worldwide Corp.*, 799 F.3d 236, 255 (3d Cir. 2015); *see also Navient*, 2017 WL

3380530, at *8 (same).[22]

    The defendants raise two fair-notice challenges to this CFPB enforcement action.

First, they say that they had no notice of a duty to take "meaningful action" to prevent

unlawful conduct by the debt collectors. *See* Docket Item 30-1 at 38-39; Docket Item

31-1 at 25-26. Second, they argue that they had no notice that they could be held

vicariously liable under the CFPA or FDCPA for the unlawful conduct of the debt

collectors. *See* Docket Item 30-1 at 38-39; Docket Item 31-1 at 26-27.

    But the CFPB does not allege that the defendants violated the law simply by

failing to take "meaningful action" to prevent unlawful conduct by the third-party debt

collectors; instead, the CFPB says that the defendants are liable for the conduct of the

third-party debt collectors based on principles of vicarious liability, individual liability, or

substantial assistance. *See* Docket Item 16 at ¶¶ 169-201. So the defendants' fair-

---

[22] In *Wyndham Worldwide*, the Third Circuit outlined several standards that might
apply when a party challenges an administrative agency's enforcement action as failing
to provide adequate notice. *See Wyndham Worldwide*, 799 F.3d at 249-55. The court
ultimately concluded that in a case "invol[ving] ordinary judicial interpretation of a civil
statute," due process notice requirements are "satisfied [] as long as the [party] can
reasonably foresee that a court could construe its conduct as falling within the meaning
of the statute." *See id.* at 253, 256. Because this case "involve[s] ordinary judicial
interpretation[s]" of the CFPA and FDCPA, the Court asks whether the defendants could
"reasonably foresee" that their conduct could be proscribed by those laws. *See id.* at
253. And the answer is that they could.

notice challenge boils down to whether they had fair notice that they could be subject to vicarious liability under the CFPA and the FDCPA and whether their conduct could be considered "substantial assistance" under the CFPA.

For many of the same reasons stated above, the defendants could have "reasonably foresee[n] that a court could construe [their] conduct as falling within the meaning of the" FDCPA and CFPA. *See Wyndham Worldwide*, 799 F.3d at 256. First, the defendants could have reasonably foreseen that vicarious liability is available under the FDCPA and the CFPA: Other courts have concluded as much for the FDCPA, *see supra* at 45-47, and Congress generally "legislates against a legal background of ordinary tort-related vicarious liability rules," *Meyer*, 537 U.S. at 285. So the defendants had adequate notice that general vicarious liability principles could apply in this case.

The defendants also argue that they had no notice of any possible enforcement action here because "[i]naction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance." *See* Docket Item 41 at 15 (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)). But the CFPB does not allege that the defendants simply failed to act to prevent violations of the CFPA; instead, the CFPB says that the defendants knowingly or recklessly assisted unlawful activity by placing debts with, or selling debts to, debt collection companies that the defendants knew violated the CFPA and FDCPA. And absent any indication of how that could not be considered substantial assistance under the CFPA, the Court cannot conclude that the enforcement action here violates due process. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (noting that "[i]t is not enough merely to mention a possible

argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones").

In sum, even if some of the legal theories outlined above present matters of first impression, the defendants still reasonably could have foreseen that their conduct fell within the scope of the CFPA and FDCPA.  For that reason, their due process argument fails.

## CONCLUSION

For the reasons stated above, the defendants' motions to dismiss, Docket Items 30 and 31, are DENIED.


SO ORDERED.

Dated:   August 22, 2023
         Buffalo, New York



 */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE